Beulah HUNTER, Jane Honorable and Sylvia Wiese, Appellants,

v.

Calvin AUGER, Warden, Iowa State Men's Reformatory, in his official capacity and individually; David Scurr, Warden, Iowa State Penitentiary, in his official capacity and individually; Jack Baughman, Former Warden, Iowa State Penitentiary, in his official capacity and individually; Jane Doe, Guard at the Iowa State Penitentiary, in her official capacity and individually; Jane Roe, Guard at the Iowa State Penitentiary, in her official capacity and individually; and the State of Iowa, Appellees.

No. 81–1354.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 13, 1981.

Decided March 11, 1982.

Gordon E. Allen, Legal Director, Iowa Civil Liberties Union, Des Moines, Iowa, for appellants.

Thomas J. Miller, Atty. Gen. of Iowa, John G. Black, Sp. Asst. Atty. Gen., Craig S. Brenneise, Asst. Atty. Gen., Des Moines, Iowa, for appellees.

Before HENLEY and ARNOLD, Circuit Judges; and HARRIS,* Senior District Judge.

HENLEY, Circuit Judge.

Appellants Beulah Hunter, Jane Honorable, and Sylvia Wiese, visitors to family members confined in Iowa penal institutions, brought an action against correctional officials and employees under 42 U.S.C. § 1983, seeking damages and declaratory and injunctive relief. They alleged, *inter alia*, violations of their fourth amendment right to be free from strip searches [1] during visits at the institutions based on mere unfounded suspicion that they would attempt to smuggle drugs to their incarcerated relatives.[2] The case was tried to the district court upon stipulated facts and accompanying exhibits. The court concluded that "neither the strip search policies nor their application to the plaintiffs in this case violated plaintiff's Fourth Amendment rights to be free from unreasonable searches." *Hunter v. Auger*, No. 79–192–2, slip op. at 5 (S.D.Iowa Feb. 26, 1981). This

appeal followed. We reverse the judgment of the district court and remand the case for further proceedings.

## I. Facts

### Appellant Honorable

On November 3, 1978 Jane Honorable, a resident of Des Moines, went to the Iowa Men's Penitentiary at Fort Madison to visit her husband Roy,[3] who was incarcerated for armed robbery. She had visited him approximately once each week since October, 1976 without incident. When appellant arrived at the facility on November 3, she was given the option of submitting to a strip search or foregoing the visit with her husband. To see her husband, she acquiesced to the search, which was conducted according to the institution's routine procedures and lasted approximately one-half hour. The body search revealed no drugs or other contraband.

On the same day, appellant met with prison officials to discuss the reasons for the search. She was informed that they had received an anonymous "kite"[4] from an inmate, advising in writing that Roy Honorable and several other inmates were trafficking in drugs. Prison officials attempted to confirm the inmate's anonymous tip by contacting the Narcotics Division of the Iowa Department of Criminal Investigation

---

* The Honorable Oren Harris, United States Senior District Judge, Eastern and Western Districts of Arkansas, sitting by designation.

1. Strip searches conducted at Iowa adult correctional facilities consist of an unclothed visual body search, including a visual inspection of the anal area while the subject is bent forward with the buttocks spread. It seems that no vaginal examination is made.

2. In their complaint, appellants also alleged deprivations of their first amendment right to freedom of association with family members confined in Iowa correctional institutions. They did not address this issue in their brief to the district court. *See Hunter v. Auger*, No. 79–192–2, slip op. at 1–2 n.1 (S.D.Iowa Feb. 26, 1981). Likewise, they do not discuss it in their brief to this court, but make only a passing reference to the claim. Hence, we do not address its merits.

3. The parties stipulated that on that date Roy Honorable was the chairman of the inmate-administration liaison committee, the head of the law library, and president of the Black Heritage Club, Gavel Club, and Toastmasters within the institution.

4. The parties' Second Supplemental Stipulation of Fact states:

 A 'kite' is a standardized $5\frac{1}{2}'' \times 7\frac{1}{2}''$ memo utilized by inmates to submit written requests or remarks to prison officials. On occasion, an informant will provide a tip to prison officials by writing the information on a kite .... Delivery may be accomplished by ... *inter alia*, hand delivery to a guard, insertion in a mail box, or sliding the kite under a door.

for a community background check on appellant and her husband.[5] The record before us, however, indicates that officials were unable to obtain any corroborative evidence. We also note that the parties stipulated that neither appellant nor her husband has ever been convicted of a drug offense.

### Appellant Wiese

In February, 1979 Sylvia Wiese, accompanied by her three year old son, went to visit her husband Michael, who was confined at the Augusta Unit of the Iowa State Penitentiary, a minimum security prison farm. As a result of an anonymous tip received from a source outside the facility that indicated she would attempt to smuggle drugs, appellant was required to undergo a strip search before being allowed a contact visit with her husband. Correctional officials admitted that she was searched on the basis of the anonymous tip and because of the open atmosphere at the Augusta Unit. No evidence was offered to show an attempt by prison officials to corroborate the information received. Like appellant Honorable, Wiese submitted to the search, which was also conducted in a routine manner. The search did not disclose any drugs or contraband of any sort.

### Appellant Hunter

On March 17, 1979 Beulah Hunter, a resident of Des Moines, Iowa, drove to the Iowa Men's Reformatory at Anamosa to visit her son Kenneth A. Hunter, who was incarcerated in that facility for armed robbery. Hunter, a woman of about fifty-five years, was accompanied by her boyfriend William Perry; her son Robert Hunter; and her grandchildren Kenneth Oakley, Kenneth Hunter's eleven year old son, and Trene Hunter, the inmate's ten year old niece. During the seven years that Kenneth Hunter had been incarcerated, appellant and her four children had visited him monthly without incident. In addition, the mother and son corresponded frequently.

Upon arriving at the institution, appellant and her party were advised that they would have to submit to a strip search before visiting Kenneth because prison officials had received an anonymous tip that the visitors would attempt to smuggle drugs during their visit. Although correctional officials attempted to confirm the information by contacting the Department of Criminal Investigation, all they learned was that the tip came from an unidentified person who called from the Gateway Opportunity Center in Des Moines, a community action program facility for low income families. The parties' stipulation of fact notes that "[n]o corroboration of [the] anonymous tip was made."

When Hunter and the other visitors refused to be strip searched, they were denied visiting privileges. In a letter dated March 22 the warden informed appellant and the persons accompanying her on March 17 that as a result of their refusal to submit to the body search, all visits to any adult correctional facility were suspended and could be reinstated only after a satisfactory personal interview. Appellant, however, did not request an interview.

We note that none of the individuals suspected of drug smuggling activity on March 17 had ever been arrested or convicted on drug charges. Further, no contraband had ever been found on the person of Kenneth Hunter[6] after a visit from his mother or anyone accompanying her to the facility.[7]

### Strip Search Policy

A visitor entering the visiting room entryway at Iowa correctional facilities is re-

---

5. Contact with the Department of Criminal Investigation is a standard procedure employed by Iowa prison administrators to validate drug related information.

6. Inmates who receive visitors are strip searched and required to change clothing both before and after the visit.

7. We note that on June 13, 1978 Kenneth Hunter received a disciplinary report for possession of a "roach clip," a metal clip that resembles tweezers and is used to hold the butt of a marijuana cigarette. Since no interference with appellant's visits occurred until March, 1979, it is apparent that this incident was not a factor in the prison officials' decision to strip search appellant and her party.

quired to submit a "Request for Visiting Permit," a standard form that the visitor completes with the inmate's name and his name, address, and relation to the inmate.[8] After the form is submitted to the visiting room guard, the inmate's visiting card is pulled to determine if the visitor is approved[9] and, if approved, whether the visitor should be strip searched. If a strip search notation appears on the visiting card, the correctional officer on duty advises the visitor that he must submit to a strip search before visiting the inmate. Because there are no facilities for non-contact visitation, a visitor to the Iowa Men's Penitentiary is given the alternative of submitting to the search or foregoing the visit. At the Iowa Men's Reformatory, a strip search is also a condition precedent to a contact visit between an inmate and a visitor suspected of carrying contraband, namely drugs. If a visitor to this institution refuses to be strip searched, however, he is in some circumstances allowed a non-contact visit with the inmate since appropriate facilities for such visitation are available there. At the Augusta Unit, inmates are allowed unlimited contact visits, including unsupervised outdoor contact with visitors. The record is unclear whether facilities for non-contact visits are available at this location.

After a visitor targeted for a strip search proceeds across the visiting room entryway through the metal detector,[10] he is taken to a small room adjacent to the visiting room where he is again informed that he must be strip searched. At this time he is given the opportunity to leave the facility rather than submit to the search. If he consents to the strip search, correctional officials conduct the search pursuant to standard institutional procedures.

Any correctional official who is authorized to order a strip search of a visitor[11] is required by prison policy, subject to time constraints, to provide the warden of the facility with a memorandum stating the inmate's and visitor's name, the items for which the search was carried out, the reasons for the search, and the time limit on the search order. Each decision to conduct a strip search is recorded in a logbook kept in the warden's office at the particular facility. Although prison policy requires that the log contain a detailed description of the basis for the search order, it appears that this requirement may be easily circumvented by using the ready excuse of insufficient

8. This form states:
 PERSONS ON THE PREMISES OF THE STATE PENITENTIARY DO HEREBY GIVE CONSENT TO A PERSONAL SEARCH AND INSPECTION OF ALL PACKAGES, PURSES AND OTHER ITEMS IN THEIR POSSESSION. REFUSAL OF CONSENT TO INSPECTION IS BASIS FOR DENIAL OF ADMISSION.
 In addition to this notice, signs are posted in plain view, notifying visitors that they are subject to routine searches of their persons and property. None of the notices provided at Iowa correctional facilities, however, expressly states that a personal search may entail an unclothed body search.

9. Iowa Code § 246.46 states:
 The following persons are authorized to visit said institutions at pleasure: The governor, secretary of state, auditor of state, treasurer of state, secretary of agriculture, members of the general assembly, judges of the supreme and district courts, ... county attorneys, and all regular officiating ministers of the gospel. No other person shall be granted admission except by permission of the warden.

10. All visitors must proceed through the metal detector. We note, however, that the initial strip search request in the visiting room entryway is made before the visitor walks through the metal detection equipment.

11. An interoffice memorandum prepared by David J. Scurr, Warden of the Iowa Men's Penitentiary, on April 25, 1980 states:
 No one is authorized to order strip searches of visitors with the exception of myself, Paul Hedgepeth, Jim Menke, Jim Helling, Ron Welder, or the Officer of the Day at ISP.
 The parties' Supplemental Stipulation of Fact sheds some light on the positions held by correctional officials designated in the Warden's memorandum. The stipulation states:
 Six administrative officials at the institutions may order a strip-search: the warden, deputy warden, director of security, director of treatment, executive assistant and the officer of the day. The officer of the day is an appointed senior administrative official who is authorized to act as the warden in his absence.

time to provide more than a cursory statement of reasons for the search. Such a built-in means of circumvention frustrates any effective review by the deputy warden, who routinely receives and examines the logbook.

We now turn our attention to a correctional policy that presents a particularly troublesome aspect of this case, that is, the placement of a strip search notation by a visitor's name on an inmate's visiting card.[12] A strip search designation may result from an anonymous tip from an inmate or a source outside the institution advising that a particular visitor will attempt to smuggle drugs during his visit to the facility. When correctional officials receive such a tip, they attempt to confirm the information by using one or more of the following means: reviewing the particular inmate's file; monitoring correspondence and telephone conversations between the parties specified; and contacting the Narcotics Division of the Iowa Department of Criminal Investigation for a community background check on the inmate and other named individuals. Appellees here freely admitted that even though attempts to corroborate an unidentified informant's tip are unsuccessful, a strip search notation may nevertheless be placed near a visitor's name on an inmate's visiting card.

A notation that a particular visitor should be strip searched may remain on a visiting card for three or four months or may be of indefinite duration, depending on the nature of the information used to originally place the visitor on the strip search list and the conduct during a visit. Strip search designations are reviewed every ninety days

and may be removed only by the warden or deputy warden.

In addition to the practice of strip searching visitors whose names have been noted on inmate visiting cards, a strip search order may result from observation of a visitor in the visiting room entryway even though no strip search notation appears on the visiting card. If the correctional officer believes that a visitor will attempt to smuggle contraband during the visit, the officer will generally detain the visitor by searching other items, for instance, a purse, while approval for the strip search is sought from an authorized official. The parties' stipulation of fact states: "Each individual authorized to order a strip-search may order such a search on the basis of a visual observation of an incoming visitor, if, in the judgment of the observor, [sic] the search is justified." [13]

## II. The Legal Standard

 The United States Supreme Court has stated:

> The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials . . . in order to 'safeguard the privacy and security of individuals against arbitrary invasions. . . .' [Citations omitted.]

*Delaware v. Prouse*, 440 U.S. 648, 653–54, 99 S.Ct. 1391, 1395–96, 59 L.Ed.2d 660 (1979). In the context of a search, the test of reasonableness requires that legitimate governmental interests in carrying out the search be balanced against the intrusion on personal rights that the search entails. *Id.*

---

**12.** Only the warden of the facility and those to whom he has delegated the authority may make such a notation.

**13.** The parties' stipulation states that "[c]ontraband has been confiscated on numerous occasions" following such searches. No details are provided. Likewise, the parties do not provide any information on the number of strip searches conducted at the various Iowa penal institutions or the results of such searches. Their stipulation states:

None of the Defendants, the individual institutions, or the Department of Corrections . . . has or maintains statistics on either the number of searches or the success of the search results. Prison officials estimate that [of] approximately 33,000 visitors in one year (1979), 680 to 700 of those visitors were required to undergo strip searches. While averaging 40 to 80 visitors a day, and on busy days, 100 visitors, the incidence of all strip searches is approximately 10 per week at the Iowa Men's Penitentiary. No estimates are available for the Iowa Men's Reformatory.

at 654, 99 S.Ct. at 1396; *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979); *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). To assess the reasonableness of a particular government intrusion, "the facts upon which [the] intrusion is based [must] be capable of measurement against 'an objective standard,' whether this be probable cause or a less stringent test." *Delaware v. Prouse*, 440 U.S. at 654, 99 S.Ct. at 1396.

It is clear that certain types of searches based upon less than probable cause are constitutionally permissible. *E.g., Bell v. Wolfish*, 441 U.S. at 560, 99 S.Ct. at 1885; *Delaware v. Prouse*, 440 U.S. at 663, 99 S.Ct. at 1401; *Terry v. Ohio*, 392 U.S. at 27, 88 S.Ct. at 1883. In these cases, courts weighing the need for the particular search against the invasion of privacy and personal security have concluded that the fourth amendment reasonableness standard allows such searches to be based on less than probable cause. We apply the same balancing test to determine whether the strip searches at issue in the instant case may be conducted only on the basis of probable cause or on a less rigorous basis.

The penal environment is fraught with serious security dangers. Incidents in which inmates have obtained drugs, weapons, and other contraband are well-documented in case law and regularly receive the attention of the news media. Within prison walls, a central objective of prison administrators is to safeguard institutional security. To effectuate this goal prison officials are charged with the duty to intercept and exclude by all reasonable means all contraband smuggled into the facility. Indeed, Iowa correctional officials recognize their duty to constrict the flow of contraband into the prison. They consider both clothed and unclothed body searches an effective means of controlling contraband and "a basic implement of the institutions['] overall security."

Although the preservation of security and · order within the prison is unquestionably a weighty state interest, prison officials are not unlimited in ferreting out contraband.

Certainly, as has been observed, one's anatomy is draped with constitutional protection. *United States v. Afanador*, 567 F.2d 1325, 1331 (5th Cir. 1978). And the state's interest must be balanced against the significant invasion of privacy occasioned by a strip search. Indeed, a strip search, regardless how professionally and courteously conducted, is an embarrassing and humiliating experience. *See United States v. Sandler*, 644 F.2d 1163, 1167 (5th Cir. en banc 1981); *United States v. Dorsey*, 641 F.2d 1213, 1217 (7th Cir. 1981); *cf. Terry v. Ohio*, 392 U.S. at 24–25, 88 S.Ct. at 1881–1882 (limited search of outer clothing for weapons is likely to be an annoying, frightening, and perhaps humiliating experience).

■ After weighing the interest of correctional officials in preserving institutional security against the extensive intrusion on personal privacy resulting from a strip search, we conclude that the Constitution mandates that a reasonable suspicion standard govern strip searches of visitors to penal institutions. We believe that this standard is flexible enough to afford the full measure of fourth amendment protection without posing an insuperable barrier to the exercise of all search and seizure powers. *See United States v. Asbury*, 586 F.2d 973 (2d Cir. 1978); *United States v. Afanador*, 567 F.2d at 1328; *United States v. Himmelwright*, 551 F.2d 991, 995 (5th Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977).

■ To justify the strip search of a particular visitor under the reasonable suspicion standard, prison officials must point to specific objective facts and rational inferences that they are entitled to draw from those facts in light of their experience. *See Terry v. Ohio*, 392 U.S. at 21, 27, 88 S.Ct. at 1879, 1883; *United States v. Clay*, 640 F.2d 157, 159 (8th Cir. 1981); *United States v. Asbury*, 586 F.2d at 976–77; *United States v. Himmelwright*, 551 F.2d at 995. Inchoate, unspecified suspicions fall short of providing reasonable grounds to suspect that a visitor will attempt to smuggle drugs or other contraband into the prison. 392 U.S. at 22, 88 S.Ct. at 1880; 551 F.2d at 995.

Instead, such insubstantial "hunches," based on individual perceptions rather than independent, articulable facts, only invite intrusions on rights protected by the fourth amendment. *Id.*

We note that the reasonable suspicion standard we have adopted requires individualized suspicion, specifically directed to the person who is targeted for the strip search. *See Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979); *United States v. Clay*, 640 F.2d at 160; *United States v. Afanador*, 567 F.2d at 1331. Mere physical proximity to or association with another individual suspected of smuggling activity does not provide the independent basis necessary for intruding on the privacy of the strip search candidate. *Id.* While in certain narrowly circumscribed situations the degree of suspicion of a visitor whom prison officials suspect of wrongdoing may be slightly enhanced by the suspicious activity of a companion who seeks to visit the same inmate, reasonable suspicion must nevertheless be aimed at the particular visitor who is the subject of the strip search. 567 F.2d at 1331. The fourth amendment clearly does not permit the affront suffered by the subject of a strip search to be based on nothing more than the casual transfer of suspicion from one visitor to another.

Reasonable suspicion also includes the requirement that prison officials have reasonable cause to believe that drugs or other contraband are concealed in the particular place they decide to search. *See United States v. Afanador*, 567 F.2d at 1329 n.4; *United States v. Himmelwright*, 551 F.2d at 995. In the context of strip searches of visitors to correctional facilities, prison officials must have reasonable grounds, based on objective facts, to believe that a particular visitor will attempt to smuggle contraband by secreting and carrying it on his person. While we recognize that reason to suspect a visitor of smuggling contraband may require a body search since the nature of the criminal activity is the concealment of contraband on the person, we emphasize that a generalized suspicion of smuggling activity is insufficient to justify the extensive intrusion of a strip search.

In light of the foregoing, we hold that in the absence of reasonable, articulable grounds to suspect a particular visitor of an attempt to smuggle drugs or other contraband by secreting them on his person, a strip search of that visitor is unreasonable under the fourth amendment.

## III. The Standard Applied

It is clear in the circumstances of this case that the strip search policy in effect at Iowa correctional facilities cannot survive critical examination under the reasonable suspicion standard. In essence, Iowa correctional policy provides certain procedures that prison officials use in attempting to corroborate an anonymous tip stating only that a particular visitor will attempt to smuggle drugs during a visit with an inmate. Whether or not attempts at confirming the tip are successful, however, prison authorities may nevertheless place a strip search notation near the visitor's name on the inmate's visiting card. To the extent that a strip search designation results from an uncorroborated anonymous tip containing a bare allegation of an attempt to carry drugs into a prison, the strip search policy at issue here unreasonably infringes on rights guaranteed by the fourth amendment.

In reaching this conclusion we are cognizant that informants' tips may vary enormously in their value to prison authorities faced with the duty of intercepting drugs or other contraband. For this reason we do not formulate one rule designed to encompass all conceivable situations. We note, however, that an anonymous tip completely lacking in indicia of reliability requires further investigation and some measure of corroboration to warrant official action. *See Adams v. Williams*, 407 U.S. 143, 147, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972). Although in the context of this case the tip need not meet the standards of *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United*

*States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), the information must nevertheless possess indicia of reliability sufficient to give prison officials reasonable grounds to suspect drug smuggling activity. *See Adams v. Williams,* 407 U.S. at 147, 92 S.Ct. at 1924; *United States v. Afanador,* 567 F.2d at 1328–29; *Ballou v. Massachusetts,* 403 F.2d 982, 986 (1st Cir. 1968), *cert. denied,* 394 U.S. 909, 89 S.Ct. 1024, 22 L.Ed.2d 222 (1969). Reasonable suspicion can exist only if the information contained in the tip is linked to other objective facts known by correctional authorities. 407 U.S. at 147, 92 S.Ct. at 1924; 403 F.2d at 986. A strip search designation in the absence of any information to buttress the bald assertion contained in the anonymous tip is clearly not based on a reasonable suspicion of drug smuggling activity. It is based on nothing more than a mere, unfounded suspicion of illegal conduct, and the resulting strip search constitutes an exercise of standardless, unconstrained discretion by prison officials in violation of the fourth amendment.[14] *See Delaware v. Prouse,* 440 U.S. at 661, 99 S.Ct. at 1400.

Accordingly, we enjoin the further application of that part of Iowa correctional policy that permits the strip search of a visitor on the basis of the unwarranted suspicion arising from a completely uncorroborated anonymous tip containing nothing more than an assertion of drug smuggling activity. We remand this case to the district court with directions to order Iowa correctional officials to develop visitation regulations that conform with the decision of this court. These regulations must, of course, be administered consistently with our decision.

In remanding this case, we offer for consideration of Iowa prison officials some specific economical alternative methods of prison visits when there is a lesser degree of suspicion than the reasonable suspicion required by the fourth amendment to strip search a visitor. First, we note that there is no doubt that contact visits provide a prime opportunity for passing contraband. *See Ramos v. Lamm,* 639 F.2d 559, 580 (10th Cir. 1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 759 (3d Cir. 1979). Because of the substantial state interest in banning drugs and other contraband from prisons, correctional officials are entitled to formulate visitation regulations designed to accomplish this end. *See Newman v. Alabama,* 559 F.2d 283, 291 (5th Cir. 1977), *cert. granted in part and remanded sub nom. Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114, *cert. denied,* 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978); *Kelly v. Brewer,* 525 F.2d 394, 399 (8th Cir. 1975). They may promulgate general rules and in their sound discretion modify them when particular situations so dictate. 559 F.2d at 291. Thus, when correctional officials have even a mere suspicion that a particular visitor will attempt to smuggle drugs, he may at times be denied a contact visit with the inmate. *See Inmates of Allegheny County Jail v. Pierce,* 612 F.2d at 759.

Alternatives to contact visits that could be implemented at comparatively small cost include visits carried on while the parties are seated across from one another at wide tables, perhaps installed with a solid partition under the table and fine mesh screens serving as dividers on top of the table. Additionally, a limited number of tables with glass partitions and telephones for private communication between the inmate and his visitor could be provided. We leave the formulation of specific regulations and methods of visitation to the informed discretion of correctional officials, recognizing that "it is not the function of the federal courts to embroil themselves unduly in matters of prison administration . . . or of prison security." *Kelly v. Brewer,* 525 F.2d at 399.

14. Lest there be any doubt, we add that the reasonable suspicion standard also applies to strip searches of visitors whose names have not previously been noted on a visiting card as a result of an informant's tip but who at some point nevertheless become candidates for a strip search, either because prison authorities personally observe suspicious activity or for another reason.

We now focus our attention on the application of Iowa prison strip search policy to appellants in the instant case. Applying the reasonable suspicion standard to the particular strip search decisions here, we conclude that in each case no legitimate basis for the search decision existed since correctional authorities clearly did not have reasonable cause to suspect appellants of smuggling drugs into the various facilities. Prison authorities ordered the strip searches of appellants wholly on the basis of uncorroborated anonymous tips merely stating that the visitors would attempt to smuggle drugs during visits with their relatives. It is clear that the record before us is not only devoid of any evidence tending to provide some degree of corroboration of the informants' assertions, but it is also destitute of any other factor, for instance, personal observation of appellants upon their arrival at the institutions, contributing to a reasonable suspicion of drug smuggling activity. *E.g., Adams v. Williams, supra; United States v. Afanador, supra.* In addition, prison officials had no information on which to assess the tipsters' reliability. *See United States v. Afanador,* 567 F.2d at 1329. For these reasons, we find that in ordering the strip searches, Iowa correctional officials violated appellants' fourth amendment rights.

Appellants have requested an award of reasonable damages. After carefully studying the record evidence, we find that there is no showing of facts justifying an award of more than nominal damages. We note that there is no evidence that appellants here were subjected to repeated incidents that intruded on fourth amendment protections. Each complaint is based on one episode. Moreover, we believe that appellants' fourth amendment rights are fully vindicated here by the grant of declaratory and injunctive relief. Accordingly, we direct the district court, on remand, to allow nominal damages.[15]

In sum, the judgment of the district court is reversed and the case is remanded for further proceedings consistent with this opinion.

---

**15.** Appellants have requested an award of attorney's fees but have not briefed this point. We refer counsel for appellants to Rule 17 of the Eighth Circuit Rules. In filing a motion pursuant to this rule, counsel will show facts supporting his entitlement to fees and will provide documents supporting an award of the amount of fees requested.