Alan F. **McDONELL**, et al., Plaintiffs,

v.

Susan **HUNTER**, et al., Defendants.

Civ. No. 84–71–B.

United States District Court,
S.D. Iowa, C.D.

July 9, 1985.

Mark W. Bennett, Staff Counsel, Iowa Civil Liberties Union, Des Moines, Iowa, for plaintiffs.

Gordon Allen, Sp. Asst. Atty. Gen., Mark Hunacek, John Parmeter, Asst. Attys. Gen., Des Moines, Iowa, for defendants.

## MEMORANDUM OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

VIETOR, Chief Judge.

This is a 42 U.S.C. § 1983 class action brought by three correctional institution employees challenging the constitutionality of an Iowa Department of Corrections policy (hereafter "the Department's policy" or "the policy") which subjects the Department's correctional institution employees to searches of their vehicles and persons, including urinalysis and blood tests, upon the request of Department officials.

The court previously entered an order, pursuant to Fed.R.Civ.P. 23(c)(3), certifying the class consisting of all individuals employed by the Iowa Department of Corrections at its various institutions throughout the state of Iowa who are covered by the Department's policies which may subject employees to searches of their personal motor vehicles and their persons, including strip-searches, and which allows Department of Corrections officials to demand urine, blood or breath specimens for chemical analysis.

Plaintiffs seek declaratory and injunctive relief on behalf of themselves and the class they represent that the Department's policy (a copy of which is attached hereto as Appendix A) violates the Fourth Amendment to the United States Constitution and plaintiffs' constitutional right to privacy.[1] Plaintiff McDonell also seeks back pay for earnings lost during his period of discharge.

Jurisdiction and venue are predicated upon 28 U.S.C. § 1343(3). Venue is proper in this district pursuant to 28 U.S.C. § 1392(a).

A preliminary injunction was issued in February of 1984, from which appeal was taken. The preliminary injunction order was affirmed. *McDonell v. Hunter,* 746 F.2d 785 (8th Cir.1984).

---

1. Although the Department's policy as written does not expressly mention submission of blood, urine and breath samples, there is no dispute that the policy is considered to include submission of such samples.

On June 6, 1985, the parties reported to the court that they have no further evidence to offer and no further briefing to present, so the case is now submitted for final decision on the evidence and briefs received by the court in conjunction with the preliminary injunction matter.

## FINDINGS OF FACT

Plaintiff McDonell was employed as a correctional officer at the Men's Reformatory at Anamosa (hereinafter "Anamosa") until he was discharged on January 19, 1984. Shortly after that he was reinstated but transferred to a different institution. He lost ten days pay. Plaintiffs Curran and Phipps, at all times material to this action, were and continue to be employed at the Iowa Correctional Institution for Women at Mitchellville (hereinafter "Mitchellville").

There are approximately 1750 correctional institution employees of the Iowa Department of Corrections who are within the certified class.

Defendant Hunter is the Superintendent and chief executive officer of Mitchellville. Defendant Sebek is the Security Director of Mitchellville, and is responsible for the implementation and enforcement of the Department's policy. Defendant Behrends is the Acting Deputy Warden of Anamosa, and is responsible for the implementation of the Department's policy. Defendant Farrier is Director and chief administrative officer of the Iowa Department of Corrections, and is responsible for the supervision and operations of Anamosa, Mitchellville, and other correctional facilities.

It is, of course, necessary to maintain security at each correctional facility, and a necessary part of security is prevention of distribution of weapons, drugs and other contraband to inmates. The Department's policy challenged in this suit is designed to serve security requirements at the state's correctional facilities.

The motor vehicle parking lot for employees at Mitchellville is within the gates of the facility, that is, within the area where inmates are confined. At all other correctional facilities the employee parking lot is on facility property outside of the confines within which inmates are confined.

When plaintiff McDonell became employed at Anamosa in 1979, he signed a consent to search, a copy of which is attached hereto as Appendix B. On January 17, 1984, plaintiff McDonell was informed by supervisory personnel at Anamosa that they had received confidential information indicating that he had been seen the previous weekend with individuals who were "being looked at" by law enforcement officials regarding drug related activities. Based on this information, the supervisory personnel requested plaintiff McDonell to undergo urinalysis. He refused and as a result his employment was terminated on January 19. Shortly thereafter he was reinstated with loss of ten days pay and transferred to another institution.

In August of 1983, employees at Mitchellville were presented a search consent form to sign, a copy of which is attached hereto as Appendix C. Plaintiffs Curran and Phipps refused to sign. There is disputed evidence that they were initially told that they would not receive their paychecks if they did not sign. In any event, they did receive their paychecks and all paychecks since then, and they have not been discharged or disciplined in any way for refusing to sign.

The Department's policy does not identify who has the authority to require an employee to submit to a search or to provide a blood or urine sample, nor does the policy articulate any standards for its implementation. No separate written standards have been promulgated governing implementation of the Department's policy. In his affidavit, defendant Farrier states: "As a practical matter, correctional officers are not asked to submit to a urinalysis or blood test unless there is some articulable reason to believe that there may be a problem."

## CONCLUSIONS OF LAW AND DISCUSSION

The Fourth Amendment to the United States Constitution states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Fourth Amendment applies to the states through the Fourteenth Amendment. *Wolf v. Colorado*, 338 U.S. 25, 27–28, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782 (1949).

■ The Supreme Court has rejected the notion of "constitutionally protected areas" and has said: "The fourth amendment protects people, not places." *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). The Fourth Amendment is intended to protect the privacy of individuals from invasion by unreasonable searches of the person and those places and things wherein the individual has a reasonable expectation of privacy. *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968). Only "unreasonable" searches are prohibited. *Carroll v. United States*, 267 U.S. 132, 147, 45 S.Ct. 280, 283, 69 L.Ed. 543 (1925).

■ Defendants suggest that Fourth Amendment considerations are not involved in this case because any searches made pursuant to the Department's policy would not be for criminal investigation purposes.[2] That contention is without merit. "It is surely anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior." *Camara v. Municipal Court*, 387 U.S. 523, 530, 87 S.Ct. 1727, 1731, 18 L.Ed.2d 930 (1967). *See Wyman v. James*, 400 U.S. 309, 317, 91 S.Ct. 381, 385, 27 L.Ed.2d 408 (1971). All of us are protected by the Fourth Amendment all of the time, not just when police suspect us of criminal conduct.

■ There is no question that one's person and one's automobile are places where one has a reasonable or legitimate expectation of privacy, and that government intrusions into those areas are searches.[3] Taking blood from the body is a search and seizure within the meaning of the Fourth Amendment. *Schmerber v. California*, 384 U.S. 757, 767, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966). Urine, unlike blood, is routinely discharged from the body, so no governmental intrusion into the body is required to seize urine. However, urine is discharged and disposed of under circumstances where the person certainly has a reasonable and legitimate expectation of privacy. One does not reasonably expect to discharge urine under circumstances making it available to others to collect and analyze in order to discover the personal physiological secrets it holds, except as part of a medical examination. It is significant that both blood and urine can be analyzed in a medical laboratory to discover numerous physiological facts about the person from whom it came, including but hardly limited to recent ingestion of alcohol or drugs. One clearly has a reasonable and legitimate expectation of privacy in such personal information contained in his body fluids. Therefore, governmental taking of a urine specimen is a seizure within the meaning of the Fourth Amendment. *Allen v. City of Marietta*, 601 F.Supp. 482, 488–89 (N.D.Ga.1985); *Storms v. Coughlin*, 600 F.Supp. 1214, 1217–18 (S.D.N.Y.1984); *Murray v. Haldeman*, 16 M.J. 74, 81 (C.M.A.1983).

*United States v. Skipwith*, 482 F.2d 1272, 1277–79 (5th Cir.1973).

**2.** It may well be that the primary purpose of a search made under the Department's policy would be to serve the facility's security needs. However, if the search yielded drugs or an illegal weapon or illegal possession of a lawful weapon, a criminal prosecution could follow and the evidence uncovered, if constitutionally obtained, could be used in the prosecution.

**3.** There are significant limits to Fourth Amendment rights in an automobile. However, an automobile is not an area totally devoid of one's reasonable expectation of privacy and Fourth Amendment protection, as suggested by defendants.

■ It is this court's conclusion that all of the intrusions authorized by the Department's policy are intrusions into areas where plaintiffs and their class normally have a reasonable and legitimate expectation of privacy protected by the Fourth Amendment. The question then becomes whether the intrusions authorized by the policy are nevertheless reasonable and therefore not violative of the Fourth Amendment.

Whether the authorized intrusions are reasonable must be evaluated in the context of the places of employment—penal institutions where security is a paramount consideration. The United States Court of Appeals for the Eighth Circuit, in a case involving the constitutionality of strip searching a prison inmate's visitor, stated:

> The penal environment is fraught with serious security dangers. Incidents in which inmates have obtained drugs, weapons, and other contraband are well-documented in case law and regularly receive the attention of the news media. Within prison walls, a central objective of prison administrators is to safeguard institutional security. To effectuate this goal prison officials are charged with the duty to intercept and exclude by all reasonable means all contraband smuggled into the facility. Indeed, Iowa correctional officials recognize their duty to constrict the flow of contraband into the prison. They consider both clothed and unclothed body searches an effective means of controlling contraband and "a basic implement of the institutions['] overall security."
>
> Although the preservation of security and order within the prison in unquestionably a weighty state interest, prison officials are not unlimited in ferreting out contraband. Certainly, as has been observed, one's anatomy is draped with constitutional protection. *United States*

*v. Afanador,* 567 F.2d 1325, 1331 (5th Cir.1978). And the state's interest must be balanced against the significant invasion of privacy occasioned by a strip search. Indeed, a strip search, regardless how professionally and courteously conducted, is an embarrassing and humiliating experience. *See United States v. Sandler,* 644 F.2d 1163, 1167 (5th Cir. en banc 1981); *United States v. Dorsey,* 641 F.2d 1213, 1217 (7th Cir.1981); *cf. Terry v. Ohio,* 392 U.S. at 24–25, 88 S.Ct. at 1881–1882 (limited search of outer clothing for weapons is likely to be an annoying, frightening, and perhaps humiliating experience).

*Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir.1982).

■ Correctional facility security considerations reduce the scope of reasonable expectations of privacy that one normally holds and makes reasonable some intrusions that would not be reasonable outside of the facility. However, security considerations do not cause prisoners to lose *all* of their constitutional rights at the prison gates. *Bell v. Wolfish,* 441 U.S. 520, 558–59, 99 S.Ct. 1861, 1884–85, 60 L.Ed.2d 447 (1979); *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974–75, 41 L.Ed.2d 935 (1974). Visitors do not lose *all* of their Fourth Amendment rights at the prison gates. *Hunter v. Auger, supra.* And prison employees do not lose *all* of their Fourth Amendment rights at the prison gates. *Armstrong v. New York State Commissioner of Correction,* 545 F.Supp. 728, 730 (N.D.N.Y.1982).

■ There is no doubt that defendants can constitutionally conduct such "regulatory" searches of persons entering Iowa's correctional facilities, including employees, as are reasonably necessary to serve security considerations, but the searches must be guided by some appropriate standards,[4]

---

**4.** A fundamental problem with the Department's policy is that it lacks any standards whatsoever for its implementation. Who can authorize or make a search or a demand for a blood or urine sample? Without any standards, it appears that any institutional officer may authorize or make

a search or demand for blood or urine at his or her own unfettered discretion, and that the procedures followed will be another matter within the unfettered discretion of the officer implementing the Department's policy. The only

and must be no more intrusive than is reasonably necessary. *Hunter v. Auger, supra; McMorris v. Alioto,* 567 F.2d 897 (9th Cir.1978). The lack of any standards is noted in footnote 4. The court now turns to the questions of the reasonable necessity for the searches authorized by the Department's policy, the reasonableness of the extent of the intrusions authorized, and purported consents to the searches.

### Searches of the Person

 A routine search of all persons, including employees, entering a correctional institution sufficiently intrusive to discover any hidden weapons is certainly reasonable. This can be accomplished by a magnetometer or a pat-down search by a person of the same sex and an inspection of the contents of packages, purses, handbags and pockets. A strip search is another matter. The "reasonable suspicion" standard for strip searching an inmate's visitor was established in *Hunter v. Auger, supra,* and the same standard has been held to apply to searches of prison employees. *Security & Law Enforcement Employees District Council 82 v. Carey,* 737 F.2d 187 (2d Cir.1984).

 This court concludes that a strip search of a correctional facility employee may constitutionally be made only on the basis of reasonable suspicion, based on specific objective facts and rational inferences that may be drawn from those facts in light of experience. *Hunter v. Auger, supra,* 672 F.2d at 674. Inchoate, unspecified suspicions are insufficient. *Id.* Furthermore, a generalized suspicion of drug smuggling activity is insufficient—there must be reasonable grounds, based on objective facts, to believe that at the time of the strip search the employee is concealing drugs on his or her person. *Id.* at 675. Also, mere association with another individual suspected of drug dealing does not provide an independent basis for a strip search. *Id.*

 Defendants argue that "mere suspicion" rather than "reasonable suspicion" should be the standard for permitting strip searches of employees. They contend that the reasonable suspicion standard established for strip searches of inmate visitors in *Hunter v. Auger, supra,* should not apply to employees because employees, unlike inmate visitors, cannot be limited to non-contact association with inmates. This position is arguable, but I do not find it persuasive. As the court observed in *Hunter:* "[T]he state's interest must be balanced against the significant invasion of privacy occasioned by a strip search. Indeed, a strip search, regardless how professionally and courteously conducted, is an embarrassing and humiliating experience." *Id.* at 674. The intrusion of a strip search is the most extreme intrusion of personal physical privacy that can be made. Concededly, the state's interest that is to be balanced against that extreme intrusion of privacy is a weighty interest. However, I believe that the state's interest will not be significantly impaired by the reasonable suspicion standard. The standard is not unreasonably burdensome.[5] If an employee is suspected of smuggling drugs into an institution, but the suspicion falls short of being a reasonable suspicion, surveillance and investigation would often either dispel the suspicion as unfounded or elevate it to the quality of reasonable suspicion. Furthermore, the state has means other than strip searches to discourage and guard against smuggling of contraband to in-

---

standard is that an after-the-fact written report be made to the institution's manager.

5. *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), and *Hunter v. Auger,* 672 F.2d 668 (8th Cir.1982), should provide guidance to defendants. Although a bare anonymous tip—one that completely lacks any indicia of reliability—will not satisfy the reasonable suspicion standard, if the information in the anonymous tip is linked to other objective facts the reasonable suspicion standard may be satisfied. Indeed, depending on the totality of the circumstances, even "probable cause" may be established. Of course, if a tip is not anonymous, the identity of the informant, his reliability, and the detail of the information he supplies may establish reasonable suspicion.

mates by institution employees. For instance, the state can, and certainly should, carefully screen and investigate the backgrounds of employment applicants. Also, drug smuggling by employees could no doubt be substantially deterred by criminal prosecution of any who are found bringing drugs into an institution. Iowa Criminal Code § 719.8. Lastly, if on a particular day an employee is the object of only mere suspicion, he could be directed to leave for the day and thereby not be given the opportunity for any contact with inmates. A balancing of the state's interest against the significant invasion of privacy occasioned by a strip search supports the constitutionality of a reasonable suspicion standard for strip searches of institution employees, but does not support the constitutionality of a mere suspicion standard.

### Searches of Automobiles

 A search of all automobiles brought within the confines of the facility where they may be reached by inmates is reasonable. However, it is unreasonable to search an employee's automobile that is parked outside the confines within which inmates are kept, even if the parking lot is on ground owned by the correctional facility. Defendants argue that if a search of an employee's automobile yields drugs, that would show that the employee probably uses drugs and might, therefore, be likely to smuggle drugs to inmates. Perhaps, but that reasoning is far too attenuated to make such a search a constitutionally reasonable one. Furthermore, the constitutionality of a search cannot rest on its fruits. The institutional security need for searching employees' cars parked outside the confines of the institution has not been shown.

### Blood and Urine Samples

 Defendants urge in support of taking blood and urine samples of employees

the same reasons urged for searching employees' cars parked outside the gates— identifying possible drug smugglers. So might searches of employees' homes and taps on their telephones. The possibility of discovering who might be using drugs and therefore might be more likely than others to smuggle drugs to prisoners is far too attenuated to make seizures of body fluids constitutionally reasonable. Defendants also argue that taking body fluids is reasonable because it is undesirable to have drug users employed at a correctional institution, even if they do not smuggle drugs to inmates. No doubt most employers consider it undesirable for employees to use drugs, and would like to be able to identify any who use drugs. Taking and testing body fluid specimens, as well as conducting searches and seizures of other kinds, would help the employer discover drug use and other useful information about employees. There is no doubt about it—searches and seizures can yield a wealth of information useful to the searcher. (That is why King George III's men so frequently searched the colonists.) That potential, however, does not make a governmental employer's search of an employee a constitutionally reasonable one.

 It is this court's conclusion that the Fourth Amendment allows defendants to demand of an employee a urine, blood, or breath specimen for chemical analysis only on the basis of a reasonable suspicion, based on specific objective facts and reasonable inferences drawn from those facts in light of experience, that the employee is then under the influence of alcoholic beverages or controlled substances.[6] *See Division 241 Amalgamated Transit Union (AFL–CIO) v. Suscy*, 538 F.2d 1264, 1267 (7th Cir.1976). *But see Allen v. City of Marietta, supra*, 601 F.Supp. at 491.

---

**6.** The Fourth Amendment, however, does not preclude taking a body fluid specimen as part of a pre-employment physical examination or as part of any routine periodic physical examination that may be required of employees, nor does it prohibit taking a specimen of blood, urine, or breath on a periodic basis as a condition of continued employment under a disciplinary disposition if such a condition is reasonably related to the underlying basis for the disciplinary action and the duration of the condition is specified and is reasonable in length.

*Consent*

Defendants contend that plaintiff McDonell and other class members who signed a written consent (Appendixes B and C) have validly consented to searches under the Department's policy.

■ A search conducted pursuant to a voluntary consent does not violate the Fourth Amendment. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). "We hold only that when the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances * * *." *Id.* at 248–49, 93 S.Ct. at 2058–59.

■ Plaintiff McDonell signed a consent form several years ago when he took employment at Anamosa. There is no evidence concerning the circumstances of that signing from which the court can determine voluntariness. Plaintiffs Curran and Phipps did not sign consents. There is no evidence concerning the circumstances of signing by class members who did sign. Under this record, the court cannot rest its decision on an assumption that plaintiff McDonell and class members who signed consents voluntarily consented in advance to any search made under the Department's policy.

■ Furthermore, it is this court's conclusion that the consent form does not constitute a blanket waiver of all Fourth Amendment rights. Within a correctional institution everybody's Fourth Amendment rights are necessarily more limited than they are outside of the institution, but as discussed at page 7 of this memorandum opinion, Fourth Amendment rights are not totally lost. The consent form, which it appears plaintiff McDonell and others signed as a condition of employment when they became employed, served to alert employees to the fact that their Fourth Amendment rights are more limited inside the correctional institution, but the consent cannot be construed to be a valid consent to any search other than one that is, under the circumstances, reasonable and, therefore, permissible under the Fourth Amendment. Public employees cannot be bound by unreasonable conditions of employment. *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). Advance consent to future *unreasonable* searches is not a reasonable condition of employment.

Defendants' reliance on *Wyman v. James, supra,* is misplaced. *Wyman* involved a state statutorily authorized home visit by a caseworker to the home of a recipient of Aid to Families with Dependent Children. The court, assuming without holding that such a home visit was a search, concluded that it was reasonable and therefore not violative of the Fourth Amendment. The numerous factors relied on in *Wyman* clearly distinguish it from the instant case.

■ The January 1984 demand on plaintiff McDonell that he submit a urine specimen for chemical testing did not have a reasonable suspicion basis, and therefore it was a demand for a seizure not permissible under the Fourth Amendment.

### JUDGMENT AND INJUNCTION ORDER

It is the declaratory judgment of the court that the Department's policy, Appendix A attached hereto, violates the Fourth Amendment rights of plaintiffs and the certified class insofar as it permits searches and seizures prohibited by the following injunction.

■ Defendants and their officers, agents, servants and employees are hereby enjoined from conducting searches of the persons of plaintiffs and members of the certified class (employees) pursuant to the Department's policy, except as follows:

(1) Employees entering, or who have entered, a correctional institution may be

searched by use of a magnetometer or similar device, by a pat-down search by a person of the same sex, and by an examination of the contents of pockets, bags, purses, packages and other containers. Such a search may be conducted without cause, but must be done uniformly or by systematic random selection, and not by discriminatory or arbitrary selection of persons to be searched.

(2) Any strip search or any other body search that is more intrusive than the type allowed by subparagraph (1) above may be made only on the basis of a reasonable suspicion, based on specific objective facts and reasonable inferences drawn from those facts in light of experience, that the employee to be searched is then in possession of a weapon or drugs or other contraband. Such a search is to be made only on the express authority of the highest officer present in the institution, made by one of the same sex in a private setting, and the specific objective facts shall be disclosed to the employee before the search is conducted and shall be reduced to writing and preserved.

Defendants and their officers, agents, servants and employees are hereby further enjoined from demanding from plaintiffs and members of the certified class (employees), pursuant to the Department's policy, any urine, blood or breath specimen for chemical analysis, except that they are not enjoined from:

(1) Demanding of an employee who has entered a correctional institution a urine, blood, or breath specimen for chemical analysis on the basis of a reasonable suspicion, based on specific objective facts and reasonable inferences drawn from those facts in light of experience, that the employee is then under the influence of alcoholic beverages or controlled substances. Such a demand is to be made only on the express authority of the highest officer present in the institution, and the specific

objective facts shall be disclosed to the employee at the time the demand is made and shall be reduced to writing and preserved.

(2) Requiring an employee-applicant or an employee to provide blood and urine specimens as part of a pre-employment physical examination or as part of any routine periodic physical examination that may be required of employees.

(3) Requiring an employee to periodically submit a specimen of blood, urine or breath as a condition of continued employment under a disciplinary disposition if such a condition is reasonably related to the underlying basis for the disciplinary action and the duration of the condition is specified and is reasonable in length.

■ Defendants and their officers, agents, servants and employees are hereby further enjoined from searching privately owned motor vehicles belonging to or used by plaintiffs and members of the certified class (employees) pursuant to the Department's policy, except that motor vehicles that are parked within the institution's confines where they are accessible to inmates[7] may be searched without cause, but such searches must be done uniformly or by systematic random selection, and not by discriminatory or arbitrary selection of employees whose motor vehicles are to be searched. Searches of employees' motor vehicles within the institution's confines where they are accessible to inmates, other than uniformly or by systematic random selection, may be made only on the basis of a reasonable suspicion, based on specific objective facts and reasonable inferences drawn from those facts in light of experience, that there is a weapon or drugs or other contraband in the motor vehicle to be searched. Such a "reasonable suspicion" search is to be made only on the express authority of the highest officer present in the institution, and the specific objective facts shall be disclosed to the employee

---

7. The term "within the institution's confines where they are accessible to inmates" means within confines within which the general inmate population is kept. The term does not mean within some outer perimeter where low security risk inmates are sometimes allowed to go on work details.

whose motor vehicle is searched before the search is conducted and shall be reduced to writing and preserved.[8]

It is the further judgment of the court that plaintiff McDonell shall be paid the ten days' salary that he lost in conjunction with his temporary discharge.

## APPENDIX A

### INSTITUTIONS—PERSONNEL

SEARCHES OF EMPLOYEES AND AUTOMOBILES AND PERMISSION TO INSPECT EMPLOYEE LIVING QUARTERS

*Policy*

Any employee or vehicle entering the grounds of an adult institution or facility may be inspected at any time for security reasons. Employees must be advised in writing by the institutional manager that such inspections of the person or vehicle are a condition of coming onto the grounds of an adult institution or facility to work. A written report of such an inspection shall be made to the institutional manager.

If an employee refuses to cooperate in such an inspection, the institutional manager is to immediately be notified. He, in turn, will render a decision as to whether or not the employee refusing to be inspected is to be relieved of duty pending disposition of the matter.

All institutions and facilities having employees living on State property shall prepare forms—and have said form signed by all employees living on State-owned or leased property. (See Appendix)

## APPENDIX B

### STATE OF IOWA
### DEPARTMENT OF SOCIAL SERVICES
### BUREAU OF INSTITUTIONS
### DIVISION OF ADULT CORRECTIONS

#### SEARCHES OF EMPLOYEES AND PERMISSION TO INSPECT EMPLOYEE LIVING QUARTERS

Any employee or vehicle entering the grounds of an adult institution or facility may be inspected at any time for security reasons. Employees must be advised in writing by the Institution Manager that such inspections of the person or vehicle are a condition of coming onto the grounds of an adult institution or facility to work. A written report of such an inspection shall be made to the Institution Manager.

If an employee refuses to cooperate in such an inspection, the Institution Manager is to immediately be notified. He, in turn, will render a decision as to whether or not the employee refusing to be inspected, is to be relieved of duty pending disposition of the matter.

All institutions and facilitites having employees living on state property shall prepare forms—a copy of which is attached—and have said form signed by all employees living on state owned or leased property.

Revised 2–22–77

I, /s/ Alan McDonell , have read and understand Section II–A–6 of the Bureau of Corrections Manual and realize that due to the nature of work, type of institution, and attitudes of some of the residents confined herein, a personal search of all persons coming into and going out of the Men's Reformatory is of benefit to the administration to curtail the movement of contraband in the institution.

**8.** None of the injunctive relief granted herein precludes any search and seizure authorized by a judicially issued search warrant, or a search and seizure without a warrant made on the basis of "probable cause" within the meaning of the Fourth Amendment if made under one of the established exceptions to the Fourth Amendment's warrant requirement, or a search made pursuant to a valid and voluntary consent given immediately before the search is conducted.

My signature on this page constitutes my permission to be searched at any time while on State property by a staff member of the same sex that I am, when the staff member is directed to do so by the Warden, person acting in that capacity, or his designated representative. I, also, agree to submit to a urinalysis or blood test when requested by the administration of the Reformatory. I further agree to cooperate and assist in any and all investigations of a security or possible criminal nature when requested to do so. I hereby affix my signature knowingly and voluntarily, absent of any duress or coercion.

/s/ Alan McDonell 3/2/79
Signature Date

/s/ D. Williams
Witnessed by

## APPENDIX C

### Department of Social Services
### Des Moines

## SEARCHES OF EMPLOYEES AND PERMISSION TO INSPECT EMPLOYEE LIVING QUARTERS FORM

I, _____, have read and understand Section II–C–5 of the Divison of Adult Corrections Manual and realize that due to the nature of work, type of institution, and attitudes of some of the residents confined herein, a personal search of all persons coming into and going out of the institution is of benefit to the administration to curtail the movement of contraband in the institution.

My signature on this page constitutes my permission to be searched at any time while on State property by a staff member of the same sex that I am, when the staff member is directed to do so by the Warden, person acting in that capacity, or his designated representative. I, also, agree to submit to a urinalysis or blood test when requested by the administration of the institution. I further agree to cooperate and assist in any and all investigations of a security or possible criminal nature when requested to do so. I hereby affix my signature knowingly and voluntarily, absent of any duress or coercion.

Signature Date

Witnessed by

AC–1201 (5/80)