In the Matter of PHIL CARUSO, as President of the Patrolmen's Benevolent Association of the City of New York, Inc., et al., Respondents, v BENJAMIN WARD, as Police Commissioner of the Police Department of the City of New York, et al., Appellants.

First Department, November 5, 1987

**APPEARANCES OF COUNSEL**

*Michael S. Adler* of counsel *(Francis F. Caputo* with him on

the brief; *Frederick A. O. Schwarz, Jr., Corporation Counsel,* attorney), for appellants.

*Raymond E. Kerno* of counsel *(Richard Hartman,* attorney), for respondents.

## OPINION OF THE COURT

SMITH, J.

Respondents appeal from an order of the Supreme Court, entered on July 7, 1986, which enjoined them from implementing New York City Police Department Interim Order No. 36 which was issued on or about June 2, 1986 (133 Misc 2d 544). Said Order No. 36 would require current and future members of the Organized Crime Control Bureau (OCCB) to submit to random drug testing without reasonable suspicion. We affirm the grant of the permanent injunction because (1) reasonable suspicion is required before the members of the OCCB can be required to submit to random drug testing, (2) the recent decision in *Matter of Patchogue-Medford Congress of Teachers v Board of Educ.* (70 NY2d 57 [1987]) requires the voiding of Interim Order No. 36, and (3) elementary protections of privacy and individual rights are absent from the order.

Interim Order No. 36 would require any police officer assigned to the OCCB to submit to drug testing at any time and without the normal requirement of a showing of reasonable suspicion of drug use. Specifically, Interim Order No. 36 requires the following: (1) All applicants for assignment to the OCCB would be required to submit to drug testing as a condition of such assignment. (2) Members submitting applications would be required to sign a form stating that they understand that drug testing is a part of the application process and a condition for continued assignment to the OCCB. Initial screening or testing could occur any time after the assignment and subsequent testing could occur periodically. (3) Members already assigned to the OCCB would be required to sign a form stating that they understand that drug screening is a condition of continued assignment to the OCCB. They would be subject to periodic testing as long as they are assigned to the OCCB. If a current member refused to sign the form, he or she would be immediately transferred from the OCCB. (4) Any applicant or member of the OCCB who, having signed the form, later refused to undergo testing would be

suspended and the refusal would be grounds for dismissal from the Police Department.

The petitioners do not object to drug screening in order to be assigned to the OCCB, nor do they object to drug testing as a part of an annual physical exam. They claim, however, that to require members of the Police Department who are assigned to the OCCB to undergo random drug testing without reasonable suspicion is a violation of their rights under the Fourth Amendment of the US Constitution and NY Constitution, article I, § 12.

A number of cases have held that reasonable suspicion is required before urine testing of members of a police department can be ordered. *(Turner v Fraternal Order of Police,* 500 A2d 1005 [DC App 1985] [regulation for drug testing based on reasonable suspicion upheld]; *City of Palm Bay v Bauman,* 475 So 2d 1322 [Dist Ct App, Fla 1985] [police department could order urine testing on basis of reasonable suspicion]; *Capua v City of Plainfield,* 643 F Supp 1507 [NJ 1986] [mass testing of urine of members of police department in absence of reasonable suspicion violated the Fourth Amendment]; *Penny v Kennedy,* 648 F Supp 815 [ED Tenn 1986] [testing of urine of police officers without reasonable suspicion enjoined]; *Bostic v McClendon,* 650 F Supp 245 [ND Ga 1986] [mass testing of urine of police officers without reasonable suspicion violated Fourth Amendment]; *Fraternal Order of Police v City of Newark,* 216 NJ Super 461, 524 A2d 430 [1987] [city directive requesting all members of narcotics unit to submit to urine testing without probable cause or reasonable suspicion violated State Constitution].) We conclude that it is not constitutionally permissible to do away with a requirement of reasonable suspicion where drug testing can be a part of an annual physical examination and drug testing is required prior to entry to the OCCB.

In the case of *Matter of Patchogue-Medford Congress of Teachers v Board of Educ. (supra),* the New York State Court of Appeals considered the constitutionality of a policy which required all probationary teachers to submit to urinalysis to detect potential drug use. The court held that such testing did not satisfy the requirements of the State and Federal Constitutions. The court concluded that the government's requirement that a person submit to urinalysis constituted a search and seizure for which reasonable suspicion was required. In reaching this conclusion the court rejected the school district's argument that requiring a urine sample did not involve a

search since urine, unlike blood, may be obtained without invading a person's body. The court determined the test to be intrusive and an invasion of privacy by its very nature, and in the manner in which a sample is obtained.

In determining that reasonable suspicion, rather than probable cause, must exist to justify the search, the court reasoned that teachers have a diminished expectation of privacy since the government is entitled to inquire into their physical fitness to perform as teachers. The school district conceded that it did not have reasonable suspicion to believe that all or any of its probationary teachers were drug abusers. It did, however, argue that reasonable suspicion is not required when a public employer decides to test all employees in a particular category for potential drug abuse. It attempted to draw an analogy to random searches at police checkpoints. While acknowledging that the courts have sanctioned certain types of random searches when the privacy interests are minimal, the government's interest is substantial, and safeguards are provided to insure that an individual's reasonable expectation of privacy is not subjected to unregulated discretion, the court noted that the test failed these requirements.

The *Patchogue* case *(supra)* requires that reasonable suspicion be established here before a member of the OCCB can be required to undergo drug testing.

In addition to the absence of reasonable suspicion as a condition for drug testing and the *Patchogue* case *(supra)*, there is a third reason why Interim Order No. 36 is invalid. That reason is the total absence of safeguards and protection for privacy in the order. This becomes clear when Interim Order No. 36 is compared with Interim Order No. 13, promulgated by the New York City Police Department on or about February 19, 1985, and with the case of *National Treasury Employees Union v Von Raab* (816 F2d 170 [5th Cir 1987]).

Interim Order No. 13, which was in effect at the time of the promulgation of Interim Order No. 36 and which continues in effect today, mandates drug testing where there is reasonable cause to believe that any police officer is wrongfully using drugs. The order also contains a number of safeguards to protect the individual affected. Specifically, Interim Order No. 13 states the following: (1) It is a mandate of the Police Department that its members not engage in illegal drug usage. (2) A Dole Test will be utilized by the Police Department "to detect the presence of drugs in the urine of members

of the service suspected of illegal drug usage." A Dole Test will be administered "when there is a reasonable basis to believe that an individual member of the service (uniformed or civilian) is wrongfully using drugs." When there is a reasonable basis to suspect drug usage, the member of the Police Department must take a Dole Test as directed. Refusal would result in suspension and subsequent charges.

The safeguards of Interim Order No. 13 for a member of the Department suspected of drug usage are present in every phase of the investigation, to wit: (1) If a member of the service "has reasonable basis" to believe that another member of the service is illegally using drugs, he or she must notify the commanding officer or duty captain, who, in turn, must notify the Internal Affairs Division, Action Desk, and comply with any instructions received. Where the observations of a member of the service formed the basis for the belief that another member is using drugs, two supervisors must observe the suspected drug abuser. (2) The supervisory officer assigned to conduct the investigation must prepare a case folder and document all aspects of the investigation. (3) A Dole Test is administered only after the investigating supervisor has conferred with and obtained the approval of an attorney in the Department Advocate's office. (4) The Dole Test is administered by the Health Services Division and certain information (including the name of the attorney in the Department Advocate's office, a name of the witness to the test and the results of the test) must be recorded in a Dole Test log. (5) Where the Dole Test does not indicate the presence of a narcotic substance or marihuana, the investigator's case file is sealed. (6) Where the Dole Test is negative, any reference to the Dole Test is expunged from the member's record.

The fact that the safeguards which are so much a part of Interim Order No. 13 are totally absent from Interim Order No. 36 is a further ground for annulling the latter order. Members of the service who have given no reasonable indication of drug usage are unfairly lumped with those reasonably suspected of drug usage. Moreover, Order No. 36 contains no safeguards whatsoever to insure the integrity of the testing procedures. It is insufficient for the respondents to attempt to persuade the court by means of affidavits that proper procedures will be used when those procedures are not provided for in the order itself. A police officer who has volunteered for and been given one of the most difficult assignments in the

Department should not be "rewarded" by diminished constitutional protection.

The *Von Raab* case *(supra)* which the dissent states is "a case strikingly similar to the present case" is, in fact distinguishable from the case at hand but, there, adequate protection was given to those undergoing drug testing. In the *Von Raab* case, the Fifth Circuit dealt only with employees of the United States Customs Service who were seeking a transfer to three kinds of jobs within the agency. These were positions directly involving the interdiction of illicit drugs, requiring the carrying of a firearm or involving access to classified information. The case did not involve those persons who were already in those positions. In the *Von Raab* case, a number of procedures were established to insure the privacy and constitutional rights of those persons who wanted to transfer into the particular positions. These protections included notice of the time for a test and permission to withdraw the application, an opportunity to list medications which might affect the conclusions of the test and the sealing of this information unless the urine test was positive, urination in private after the outer garments had been surrendered to an observer, establishment of a chain of custody form and an opportunity for the employee to designate a laboratory to independently test the original sample. Based in part on the protections afforded the applicants for the positions in question, the Fifth Circuit upheld the urine testing without the necessity of a finding of reasonable suspicion.

For the foregoing reasons, the order and judgment (one paper) of the Supreme·Court, New York County (Stanley Parness, J.), entered July 7, 1986, which granted the petition to the extent of annulling and permanently enjoining respondents from implementing Interim Order No. 36, insofar as it requires present and future members of the Organized Crime Control Bureau to submit to urinalysis testing periodically, on a random basis, is affirmed, without costs and without disbursements.

ROSENBERGER, J. (dissenting). I dissent and would reverse the order of the Supreme Court. Petitioners-respondents, the Patrolmen's Benevolent Association of the City of New York (PBA)* and its president, brought this article 78 proceeding on

---

* The Patrolmen's Benevolent Association is the duly authorized bargaining agent and representative for the members of the New York City Police Department having the rank of police officer.

behalf of all members of the Police Department of the City of New York (Department) having the rank of police officer, currently assigned or who will be assigned to the Organized Crime Control Bureau (OCCB), against respondents, the Department, its Commissioner, and the City of New York. Petitioners-respondents challenge the constitutionality of that portion of Interim Order No. 36 which requires present and future members of OCCB to submit to random urinalysis testing to detect drug use, approximately once a year and no more than twice a year, as a condition of continued assignment. Essentially, petitioners-respondents assert that, in dispensing with reasonable suspicion as a predicate for testing, the directive provides for unreasonable searches and seizures in violation of the Fourth Amendment of the US Constitution and NY Constitution, article I, § 12. Respondents-appellants appeal from the order of Special Term which issued a permanent injunction and denied respondents-appellants' cross motion to dismiss the petition. The decision is reported at 133 Misc 2d 544.

BACKGROUND

### Duties and Responsibilities of OCCB Members

OCCB is responsible for the investigation of complaints involving organized crime activity, including, but not limited to, the enforcement of laws prohibiting the use and sale of narcotics, gambling, and prostitution. Of the 1,173 members assigned to OCCB, 627 work in the Narcotics Division, 80 work in narcotics-related task forces of the Special Services Unit, 207 work in the Public Moral Divisions, and 102 work in the Organized Crime Investigation Division. The remainder work in other areas of the Special Services Division and the Auto Crime Division. OCCB is staffed exclusively by volunteers. Higher standards of admission and conduct are imposed by OCCB than by other divisions of the Department. Applicants are screened; they must submit detailed information concerning their finances and personal backgrounds, and undergo thorough investigation.

### Nature and Scope of the OCCB Drug/Narcotic Screening Program

On June 2, 1986, respondent-appellant Commissioner issued Interim Order No. 36, titled "Implementation of Drug/Narcotic Screening (Dole test)" for members applying for and assigned to the OCCB. The directive implements a periodic

drug screening program applicable to members of the Department who applied or were currently assigned to OCCB. Already in place was Interim Order No. 13 requiring all members of the Department to submit to urinalysis testing where there is "reasonable basis" to suspect illegal drug use. Interim Order No. 13 requires the Department to investigate suspected drug use by members (except where expedited testing is necessary), to inform the Department Advocate's office, and to obtain its approval prior to administering a test.

The directive at issue, Order No. 36, states that all applicants and current members of OCCB will be required to submit to drug screening as a condition of such assignment; that they will be required to sign a form stating that they understand that drug screening is a part of the application process and a condition of continued assignment to OCCB; and that they will be subject to periodic testing as long as they are assigned to OCCB. It provides further that an officer who declines to sign the notice form will be immediately transferred from OCCB to another assignment, with no penalty of loss in rank or salary. An officer who signs the notice and thereafter refuses to submit to testing will be suspended, and such refusal will be grounds for dismissal.

By order to show cause dated June 5, 1986, and verified petition, petitioners-respondents commenced this proceeding, seeking an order staying implementation of that portion of the directive which relates to current and future members of OCCB pending determination of their administrative petition by the Office of Collective Bargaining. Petitioners-respondents conceded the validity of the directive insofar as it relates to the application process. Petitioners-respondents then amended the petition to seek an order preliminarily and permanently enjoining respondents from implementing the directive.

Respondents-appellants submitted, *inter alia,* the affidavit of Richard Koehler, the Chief of Personnel of the Department, sworn to on June 12, 1986, in opposition to the preliminary injunctive relief and in support of their cross motion to dismiss the proceeding. Koehler averred that the Department will implement the directive by testing all members of OCCB, regardless of rank, at the same time (over a two-day period), on an unannounced basis. The test results will be kept secure, under lock and key, and be kept confidential unless and until disciplinary charges and specifications are served. The urine specimen will be taken in a bathroom, under the observation of a supervisor of the same sex to prevent tampering. By order

dated June 16, 1986, Special Term issued a preliminary injunction.

Respondents-appellants subsequently revised the program, as explained by Koehler, in his supplemental affidavit, sworn to on June 24, 1986, essentially to select OCCB members for testing approximately once a year on a random basis by computer. A computer program will be designed to select at random approximately 30 to 40 OCCB members for testing on a given date based solely on the digits in the Social Security numbers of all OCCB members. The computer program will randomly select similarly sized groups as frequently as necessary to assure that all members will be tested once a year. After a member has been tested his number will be removed from the initial selection pool for the remainder of the year. However, to maintain the deterrent effect of the program for the remainder of the year, a secondary selection pool composed of those already tested will be established. A few persons will also be chosen for second testing under the same computer selection process.

The members selected for testing will be advised to report, either to a medical facility or to the Department's Health Service Division. Only a health professional of the same sex as the officer will be present while the urine specimen is given. The room will be closed and no one else may be present in, or view, the room. After the urine has been subjected to chemical analysis to detect drug consumption (the "Dole test"), the report of a negative result as well as the urine will be destroyed. Positive results will only be used for disciplinary proceedings, not for criminal prosecution. A member who disputes a positive test result has 60 days to request the sample for further testing.

Special Term held that compulsory urine testing constitutes a search and seizure within the meaning of the Fourth Amendment; that police officers retained substantial Fourth Amendment rights, albeit somewhat more circumscribed than those of other citizens, given the government's legitimate interest in maintaining police integrity, order, and discipline in its law enforcement and the peculiarly sensitive nature of the OCCB assignment. While the court acknowledged that members volunteering for OCCB should anticipate a diminished sphere of privacy in the area of drug testing, the court nevertheless found the challenged drug testing program to be standardless, and the intrusion more extensive than blood testing. Special Term concluded that "respondent has failed to

demonstrate that * * * order No. 13 coupled with * * * other less intrusive methods would not substantially accomplish the same purpose they now seek without subjecting officers to the serious invasion of privacy which would be occasioned were order No. 36 to be implemented" *(supra,* 133 Misc 2d, at 557).

The threshold issue in this case is whether the OCCB drug screening program constitutes a search and seizure within the purview of either NY Constitution, article I, § 12 or the Fourth Amendment of the US Constitution. The majority of Federal courts which have addressed this issue agree that the taking of a urine specimen for drug testing is a search and seizure, although they differ as to whether, and under what circumstances, such searches may be conducted without a warrant. *(McDonell v Hunter,* 612 F Supp 1122 [SD Iowa 1985], *mod* 809 F2d 1302, 1307 [8th Cir 1987]; *National Treasury Employees Union v Von Raab,* 649 F Supp 380, 386 [ED La 1986], *vacated* 816 F2d 170 [5th Cir 1987]; *Shoemaker v Handel,* 795 F2d 1136 [3d Cir], *cert denied* — US —, 107 S Ct 577 [1986]; *Division 241 Amalgamated Tr. Union v Suscy,* 538 F2d 1264 [7th Cir], *cert denied* 429 US 1029 [1976]; *Air Traffic Specialists v Dole,* — F Supp —, — [Alaska, Mar. 27, 1987, No. A87-073]; *Capua v City of Plainfield,* 643 F Supp 1507 [NJ 1986]; *Allen v City of Marietta,* 601 F Supp 482, 488-489 [ND Ga 1985].) As far as New York courts are concerned, however, the threshold constitutional issue has been resolved by the Court of Appeals recent decision in *Matter of Patchogue-Medford Congress of Teachers v Board of Educ.* (70 NY2d 57 [1987]).

Although the petitioners in the *Patchogue-Medford* case, like petitioners-respondents herein, did not specifically address their arguments to the State constitutional question, the Court of Appeals, nevertheless, found that the general assertion of "constitutional rights without specifically relying on either the Federal or State Constitutions" was sufficient to raise both constitutional claims *(supra,* at 65). The court held that the urine tests required of all probationary teachers seeking tenured appointments in the Patchogue-Medford School District constituted a search and seizure under Federal and State Constitutions. Moreover, after assessing "the reasons for the search and the extent to which it intrudes on legitimate privacy interests" *(supra,* at 68) and the reasonableness of the governmental action, the Court of Appeals rejected the testing requirement, which was not based on reasonable, individualized suspicion, as constitutionally invalid.

However, the Court of Appeals did not, as the majority find, require "reasonable suspicion" in all cases as a predicate for drug testing of State employees: "Thus random searches conducted by the State without reasonable suspicion are closely scrutinized, and generally only permitted when the privacy interests implicated are minimal, the government's interest is substantial, and safeguards are provided to insure that the individual's reasonable expectation of privacy is not subjected to unregulated discretion" *(supra,* 70 NY2d, at 70). Contrary to the conclusion reached by the majority, the drug testing program established by Interim Order No. 36 withstands close scrutiny and is permissible under the New York and United States Constitutions.

The essential purpose of the constitutional restraints on searches and seizures by the government is "to impose a standard of 'reasonableness' upon the exercise of discretion by government officials" *(Delaware v Prouse,* 440 US 648, 653-654 [1979]) in order "to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *(Camara v Municipal Ct.,* 387 US 523, 528 [1967]; *McDonell v Hunter, supra,* at 1130.) Inasmuch as constitutionally protected rights are implicated, the court must consider whether the complained of directive, in calling for searches without a warrant and without the predicate of probable cause based on individualized suspicion, meets the test of reasonableness.

The test of reasonableness defies mathematically precise formulation, and requires, in every case: "a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *(Bell v Wolfish,* 441 US 520, 559 [1979].) In other words, "[t]o determine reasonableness, the court must balance the intrusiveness of the search on the individual's fourth amendment interests against its promotion of legitimate governmental interests". *(Security & Law Enforcement Employees, Dist. Council 82 v Carey,* 737 F2d 187, 201 [2d Cir 1984].) The degree of intrusion on an individual's constitutionally protected privacy and security must be assessed with reference to the person's legitimate expectations of freedom from interference in the context in which these rights are asserted.

Special Term correctly found that police officers have dimin-

ished expectations of privacy, as compared to private citizens, in view of the government's interest in maintaining integrity, order, and discipline in law enforcement. The reasonable expectations of OCCB members to privacy are diminished still further by the peculiarly sensitive nature of their assignment *(supra,* 133 Misc 2d, at 552). Special Term, nevertheless, concluded that the proposed random testing program was an unreasonable and unwarranted intrusion into the narrowed scope of privacy rights enjoyed by those involved in this particularly sensitive area of law enforcement. However, I believe that Special Term misapprehended the nature of the OCCB drug testing program and overestimated its intrusiveness in concluding that the program was unreasonable.

Bearing in mind that decisions by prior courts which have considered Fourth Amendment issues arising from drug testing are not precise guidelines, because there are no bright line standards for reasonableness, I am persuaded that the duties of OCCB members and the environment in which they operate, where easy access to drugs and the consequent danger of corruption are ever present, justify the instant program. In my view, the intrusiveness of the program upon the legitimate expectations of privacy which OCCB members enjoy in their off-duty conduct is minimal, and is substantially outweighed by the compelling governmental interests here at stake. Respondents-appellants have demonstrated the necessity for and reasonableness of the random drug testing program.

The record contains ample evidence to support respondents-appellants' determination that the program at issue is necessary to deter corruption and assure public confidence in the integrity of the OCCB. The affidavit of Richard Koehler, the Chief of Personnel of the Department, established that the OCCB is composed of a substantial number of recruits who, by virtue of their relative youth, are particularly vulnerable to drug use. Between 1984 and mid-June of 1986, narcotics-related disciplinary charges were filed against approximately 39 OCCB tenured members, 6 as a result of ordinary investigation. Twenty-two of these OCCB members tested positive, and 11 refused to undergo testing.

Contrary to the conclusion of Special Term, the actual number of OCCB members apprehended using drugs is not controlling. The Fifth Circuit, in *National Treasury Employees Union v Von Raab* (816 F2d 170, *supra)* upheld a drug-screening program for customs agents working in sensitive areas as a reasonable preventive measure despite the fact that "the

Customs Service did not attempt to justify drug screening on the ground that it suspected a significant level of drug use among its employees" (at 173). In *Barry v City of New York* (712 F2d 1554, 1561 [2d Cir], *cert denied* 464 US 1017 [1983]) the Second Circuit held that: "the City Council could reasonably conclude" that the financial disclosure requirement "would help deter corruption and conflicts of interest in the Fire Department" and enhance public confidence in the integrity of the government despite the Fire Department's virtually corruption-free history.

The ability of firefighters to perform their jobs is not dependent upon the public's perception of the integrity of the Fire Department. *(See, Capua v City of Plainfield,* 643 F Supp 1507, 1519 [NJ 1986].)* However, the loss of public confidence would jeopardize the effectiveness of the OCCB which, unlike the Fire Department, relies on the public's perception of law enforcement officials as free from corrupting influences in seeking the cooperation and assistance of individual citizens. "An employee's use of the substances he has been hired to interdict casts substantial doubt upon his ability to carry out his duties honestly and vigorously, and undermines public confidence in the integrity of the [Customs] Service." *(National Treasury Employees Union v Von Raab, supra,* at 178.)*

In *Von Raab (supra),* a case strikingly similar to the present case, the Fifth Circuit reversed the District Court order which had preliminarily enjoined the mandatory drug testing program implemented by the United States Customs Service, and granted the government's motion to dismiss. The Customs Service drug testing program required job applicants and current employees moving into sensitive jobs, including drug agents and employees with access to classified information and law enforcement files, to submit to urinalysis for detection of drug use. The Fifth Circuit held that the Customs Service program was reasonable under the Fourth Amendment, based upon "the strong governmental interest in employing individuals for key positions in drug enforcement who themselves are not drug users and the limited intrusiveness of this particular program" *(supra,* at 173).

OCCB members, whose positions constantly expose them to narcotics traffic, present far greater drug abuse risks than school teachers or even other police officers. Contrary to the contention of the petitioners-respondents, there is no clear distinction between the various OCCB subdivisions in terms of the degree of exposure to narcotics. Even those in OCCB who

specialize in enforcing the laws against prostitution, organized crime, and other illicit activities are indirectly exposed to narcotics traffic because persons engaged in these activities are often involved with narcotics. *(See, Matter of Puig v McGuire,* 121 AD2d 853 [1st Dept 1986] [annulling, as an excessive penalty, the dismissal of an undercover officer assigned to infiltrate terrorist groups whose members used drugs because the pressures of his assignment had caused his problems].)

Drug use by OCCB members poses a grave danger to the Department's ability to apprehend narcotics traffickers and interdict this nefarious trade. Unlike school teachers, firefighters, and even most other police officers, OCCB members are often required to infiltrate the organizations under investigation and to spend considerable time associating with criminal elements. A member of this elite unit who is compromised by drug use is easy prey to blackmail and corruption.

Based upon the evidence of drug use by recruits and tenured OCCB members, the widespread, large scale drug use in society, and the data concerning the value of periodic testing, respondents-appellants could reasonably conclude that aggressive preventive measures were necessary. Respondents-appellants were not required to wait until drug use among OCCB members resulted in obvious on-duty impairment or a life-threatening incident before taking steps to deal with the problem. Drug use by OCCB members poses a serious danger to effective law enforcement, which can only be satisfactorily controlled by periodic drug testing, based on neutral and random selection factors.

In *Shoemaker v Handel* (795 F2d 1136 [3d Cir], *cert denied* — US —, 107 S Ct 577 [1986], *supra),* the Third Circuit approved the program of uniform breathalyzer testing and random urinalysis testing implemented by the New Jersey Racing Commission for jockeys. The court reasoned that the State had a strong interest in assuring the public of the integrity of persons engaged in the horse racing industry, an industry whose success depends upon the public's confidence in it. The court noted that jockeys were on notice that horse racing was an intensely regulated industry with existing regulations which authorized, *inter alia,* warrantless searches of stables. Therefore, their legitimate expectations of privacy were diminished. Further, the jockeys were notified in advance of the testing program that they would be subject to

breathalyzer and urinalysis testing on days that they were engaged to race *(supra,* 795 F2d, at 1142).

Contrary to the view of Special Term *(supra,* 133 Misc 2d, at 556) I believe that *Shoemaker (supra)* was correctly decided, although not controlling in the present case. In reaching the conclusion that *Shoemaker* was wrongly decided, Special Term relied, in part, on *City of Palm Bay v Bauman* (475 So 2d 1322 [Dist Ct App, Fla 1985]) and the District Court's decision in *McDonell v Hunter* (612 F Supp 1122, *supra).* However, as discussed *infra,* the lower court's order in *McDonell,* insofar as it disapproved the urinalysis testing, was reversed on appeal by the Eighth Circuit. The plaintiffs in *City of Palm Bay,* in sharp contrast to the plaintiffs in *Shoemaker* and petitioners in the present case, were subjected to drug testing *en masse* on an unannounced basis. No directive or policy statement establishing standards for the implementation of such tests was ever written or communicated *(supra,* 475 So 2d, at 1325; *see also, Capua v City of Plainfield, supra,* 643 F Supp, at 1515).

The "regulated industry" argument advanced in *Shoemaker (supra)* as an extension of the administrative search exception to the Fourth Amendment warrant requirement *(see, United States v Biswell,* 406 US 311, 315-317 [1972]) has been rejected by at least one Federal court *(American Fedn. of Govt. Employees, AFL-CIO v Weinberger,* 651 F Supp 726, 734-735 [SD Ga. 1986]; *but see, McDonell v Hunter, supra; Rushton v Nebraska Pub. Power Dist.,* 653 F Supp 1510, 1524-1525 [Neb 1987] [drug and alcohol testing for nuclear plant employees with access to protected areas upheld under *Shoemaker* rationale]).

Recently, a New Jersey appellate court agreed that *Shoemaker (supra)* was inapplicable to public employees generally *(Fraternal Order of Police v City of Newark,* 216 NJ Super 461, 524 A2d 430, 434-435 [1987]). The New Jersey court upheld the challenge to the Newark Police Department's uniform drug screening program, which required both urinalysis and blood tests for all members of the narcotics bureau. It distinguished *Shoemaker* on the ground that "[p]olice officers are not members of a 'highly-regulated industry' " *(supra,* 216 NY Super, at 469, 524 A2d, at 434); nor could the testing be justified under the administrative search exception, as elaborated in *Donovan v Dewey* (452 US 594, 598-602 [1981] [warrantless inspection of privately owned commercial property is not an unreasonable intrusion if conducted pursuant to a comprehensive and defined regulatory scheme which is neces-

sary for the furtherance of an important governmental interest]).

While I would not extend the administrative search exception recognized in *Shoemaker (supra)* to all public sector employees simply because they are subject to statutory and administrative regulations, or because, by the very nature of their employment, they are charged with furthering governmental interests, I think that the logic of *Shoemaker* should be considered in this case. The significance of the "regulated industry" finding in *Shoemaker* was that it served to identify a class of enterprises or activities in which pervasive governmental control "has reduced the justifiable privacy expectation of the individual searched" *(Rushton v Nebraska Pub. Power Dist., supra,* 653 F Supp, at 1524). This, in addition to the strong governmental interest affected by the enterprise or activity, is what may justify an administrative search of persons engaged in such activity even in the absence of individualized suspicion. As already noted, those involved in law enforcement must expect that their privacy will be restricted by the nature and the demands of their work. What is to be considered is whether the degree of governmental intrusion occasioned by the random urinalysis testing is warranted by the importance of the State interest asserted.

On the continuum of governmental interests, the interest of the Department in assuring the integrity of the OCCB is at least as compelling as the interest of the New Jersey Racing Commission and the State of New Jersey in protecting the integrity of horse racing and the confidence of the wagering public. It is on a par with the interest of prison officials in safeguarding the security of correctional institutions, and of the Customs Service in protecting its drug interdiction program. *(McDonell v Hunter, supra; Security & Law Enforcement Employees, Dist. Council 82 v Carey,* 737 F2d 187, *supra; National Treasury Employees Union v Von Raab, supra.)* There can be no doubt that the government's interest is substantial, as required by the Court of Appeals in *Matter of Patchogue-Medford Congress of Teachers v Board of Educ.* (70 NY2d 57, *supra).* At issue is the freedom from illegal drug use by those members of the Police Department upon whom the government has placed the primary responsibility for the prevention and elimination of such illegal drug use by others.

The recent decision of the Eighth Circuit in *McDonell v Hunter (supra)* is instructive. In *McDonell,* correctional employees challenged the constitutionality of the policy of the

Iowa Department of Corrections requiring employees to submit to vehicle searches, body ("strip") searches, and blood tests. The District Court issued a preliminary injunction which was affirmed on appeal (746 F2d 785 [8th Cir 1984]). However, on the merits, the Eighth Circuit modified the District Court order to the extent of permitting urinalysis drug testing. The court held that drug testing was reasonable because of the limited intrusiveness of the procedures and the strong interest of prison officials in assuring that employees having daily contact with prisoners in medium or maximum security prisons, are themselves not impaired by drugs or alcohol so as to jeopardize prison security. The court determined that testing, either on a limited uniform basis or a systematic but random basis, was the only satisfactory way to control the threat posed to prison security (supra, 809 F2d, at 1308).

Like the Eighth Circuit in McDonell (supra), I believe that urinalysis testing is minimally intrusive, much less drastic in nature than a strip search or a blood test (supra, 809 F2d, at 1308), and is justified by the State's compelling interest in assuring that the police agents it sends to infiltrate organized crime and narcotic networks do not become compromised by drug use. However, the court must also scrutinize the proposed drug testing program to determine whether it contains adequate procedural safeguards to protect OCCB members from the unregulated discretion of their superiors.

Although the majority find a "total absence" of procedural safeguards under Interim Order No. 36, I disagree. As in Von Raab (816 F2d 170, supra), those now serving in OCCB, as well as those who volunteer for this assignment in the future, have been given notice that participation in the drug screening program is a condition for their continued assignment to or acceptance in OCCB. The program does not infringe on protected interests under the Due Process Clause of the Fourteenth Amendment as OCCB members have no liberty, reputational or property interest in their assignments, which are purely voluntary and temporary in nature (see, Capua v City of Plainfield, supra, 643 F Supp, at 1520 [the termination of firefighters based on results of unannounced en masse testing violated constitutionally protected liberty and property interests of city employees without due process]). Significantly, present OCCB members will have the option of transferring out of the Bureau before the program is implemented without loss of pay or rank.

The OCCB drug testing program is neither "standardless", as Special Term indicated in its opinion, nor at the "unfettered discretion" of the Police Commissioner, as petitioners-respondents and the majority maintain. Under the program there is no room for the Police Commissioner or Department officials to exercise standardless discretion. OCCB members are selected for testing randomly by computer based upon a neutral criterion, their Social Security numbers. Thus, unlike Interim Order No. 13 under which an investigation must precede the order to submit to drug testing, no adverse inference arises under Interim Order No. 36 from the fact that a member is selected for testing.

The OCCB drug testing program, like the regulation in *Shoemaker (supra,* 795 F2d, at 1143), contains procedural safeguards to protect the dignity of those being tested and to limit strictly the use of the test results and guarantee their confidentiality. The specimen is collected in a private room at a medical facility with a medical professional of the same sex present to insure that the specimen is properly labeled and not tampered with. Test results are kept confidential, under lock and key and, as with Interim Order No. 13, test results which are negative are destroyed. A member whose test is positive may, within 60 days, request that further testing be done. Positive test results will be used only for departmental disciplinary purposes, not criminal prosecution.

The procedural guidelines in the OCCB drug testing program, which guarantee the confidentiality of the test results from criminal law enforcement agents, and the lack of a risk of criminal prosecution, are vital to my conclusion that the legitimate privacy interests of OCCB applicants and members have been respected.

I hasten to add that while I cannot agree with Special Term that involuntary consents to searches are at issue, I agree with its conclusion that there is no government employer's exception to the Fourth Amendment. Any argument by the government that it should be exempt from constitutional strictures for purposes of ferreting out drug abusers or, more benignly, to assure the fitness of its employees, has ominous overtones, and must be rejected. *(American Fedn. of Govt. Employees, AFL-CIO v Weinberger, supra,* 651 F Supp, at 737; *Capua v City of Plainfield, supra,* 643 F Supp, at 1515.)

Accordingly, I would reverse the order and judgment (one paper) of Supreme Court, New York County (Stanley Parness,

J.), entered July 7, 1986, which granted the petition to the extent of annulling and permanently enjoining respondents from implementing Interim Order No. 36 insofar as it requires present and future members of the Organized Crime Control Bureau to submit to urinalysis testing periodically, on a random basis, deny the petition, and dismiss the proceeding.

MURPHY, P. J., ROSS and MILONAS, JJ., concur with SMITH, J.; ROSENBERGER, J., dissents in an opinion.

Order and judgment (one paper), Supreme Court, New York County, entered on July 7, 1986, affirmed, without costs and without disbursements.