OPINION OF THE COURT
Karla Moskowitz, J.
Petitioners bring this CPLR article 78 proceeding to enjoin respondents’ proposed random drug testing program for New York City correction officers. The court grants the petition and enjoins respondents from implementing the program set forth in their November 17, 1987 directive.
*784 PARTIES’ CONTENTIONS
Petitioners contend there is no serious drug abuse problem among a significant number in the Department. They submit that detection and deterrence of alleged illegal drug use by correction officers can readily be accomplished by a more aggressive program of educating superior officers in discerning the currently acceptable standard for urinalysis, i.e., reasonable suspicion of illegal drug use.
Respondents maintain there is a documented problem of illegal drug use by correction officers. They claim that, since January 1985, 121 tenured officers have tested positive in drug tests conducted by the Department’s Health Management Division. They also claim that less comprehensive measures have not been successful in preventing an increase in the number of correction officers using illegal drugs. Dr. Robert F. DuPont, a former director of the National Institute of Drug Abuse, states that recognized medical knowledge indicates that reliance solely on observation of overt physical symptoms is ineffective in detecting illegal drug use. Respondents claim random urinalysis is the most effective means of detecting illegal drug use and also a major deterrent to such drug use.
Petitioners argue that random drug testing violates the constitutional rights of correction officers. They maintain the challenged random drug testing program is virtually identical to the one recently held unconstitutional in Matter of Caruso v Ward (133 Misc 2d 544 [Sup Ct, NY County 1986], affd 131 AD2d 214 [1st Dept 1987]). Moreover, they submit that respondents’ present drug testing program, based upon a "reasonable suspicion” standard, is effective in both detecting and deterring illegal drug use without infringing on correction officers’ constitutional rights.
Respondents contend the challenged random drug testing program is a reasonable, constitutionally permissible search, given the critical safety functions a correction officer performs, the reasonable scope of privacy expectations members of the paramilitary correction work force have, the limited intrusion the challenged urinalysis procedure makes, and the likelihood that less comprehensive measures would not be effective in reversing the claimed problem of illegal drug use in the Department of Correction’s work force.
THE DIRECTIVE
The challenged directive states that the Department of *785 Correction needs to institute random drug testing "to detect and deter the use of illegal drugs by members of the Department” allegedly because: "In spite of an aggressive drug prevention educational program and testing procedures, including an aggressive reasonable suspicion testing program, the Department has documented a serious drug abuse problem among a significant number of its members.” (Directive ¶ V.)
In paragraph VI (A) the directive provides for a random selection process by computer based on an employee’s Social Security number. As a result, some employees may be selected more than once, some not at all, although each has the same chance of being selected. Each biweekly pay period 50 random numbers are chosen from all members of the Department up to and including the respondent correction commissioner. These numbers are matched against the employee’s Social Security number. A Legal Division representative then matches the list of randomly selected Social Security numbers with the names of the corresponding employees.
The Legal Division representative then gives the names to the Integrity Control officer or designated supervisor who in turn contacts the Health Management Division. The Integrity Control officer or designated supervisor personally notifies the selected member on the day of the scheduled exam to report for testing. No one may be excused or rescheduled without approval of the Legal Division representative. Failure to report or cooperate or refusal to be tested is cause for suspension without pay. Probationary members are terminated. Tenured members found guilty after an administrative hearing face penalties which include termination.
The testing procedures are set forth in great detail in subdivision (B) of paragraph VI. The Health Management Division (HMD) staff is to verify the identification of the person. A supervisor or HMD staff member of the same gender as the employee will insure the "integrity” of the testing procedure. The member is to provide the specimen in the privacy of a stall with a door that can be closed or another partitioned area that allows for individual privacy. The staff member is to remain in the room, but outside the stall until the specimen is provided.
Other safeguards are provided to assure that the sample is not altered — (e.g., toilet bluing agent to deter the dilution of specimens, removal of all outer garments and personal belongings before entering the stall).
*786 If there is reasonable suspicion to believe that the member providing the specimen has attempted to alter it, the staff member is to document the facts in writing giving rise to the suspicion, and the member is to provide another specimen under direct observation of the staff member, and both specimens are to be analyzed. If there are no reasonable grounds for believing the specimen has been altered, but the lab report reflects that the specimen has been adulterated, that is to provide the basis for disciplinary charges and additional testing under direct observation of a staff member.
Immediately after collecting the specimen, the supervising staff member is to test and examine the specimen which is then tightly capped, properly sealed with evidence tape and labeled in the presence of the member tested who is to initial the label and any forms. The storage, transportation, and surrender of the specimens to the lab is to be under the strict supervision of the HMD in order to maintain an "unbroken chain of custody” throughout the procedure. The member is required to complete a form which is to include information relative to any medication, alcohol and foods ingested within the previous 24 to 72 hours. This form is forwarded to the Legal Division representative. Upon request, HMD is to provide the member with copies of the forms relevant to the test (directive, ¶ VI [B]).
The directive provides for thin layer chromatography (TLC) and the enzyme multiplied immunoassay technique (EMIT) testing procedures at "recognized professional laboratories” without specifying which test. Positive results must be confirmed by gas chromatography/mass spectrometry (GC/MS) (directive, ¶ VI [C]). Positive specimens are to be preserved for a period of six months at the laboratory. An employee may have the specimen retested at another laboratory of his or her own choice at his or her own expense. (Directive, ¶ VI [D].)
Negative lab results are retained in a file at the Legal Division. No record is to be maintained in the employee’s personnel file. If the lab results are positive, a copy of the results is retained in a file at the Legal Division. The original copy is forwarded to the Division of Employee Discipline with copies to the Operations Division and the member’s facility. Within 72 hours the member’s commanding officer is to issue a memorandum of complaint against the member to the commissioner. (Directive, ¶ VI [F].) However, the directive does not state what penalties will be imposed for failure to pass the drug test.
*787 DISCUSSION
Respondents’ present drug testing program, based upon the "reasonable suspicion” standard, was recently found not violative of Fourth Amendment rights. (Matter of King v McMickens, 120 AD2d 351 [1st Dept 1986].) Respondents now seek to abandon the "reasonable suspicion” standard and institute a "random” drug testing program. Respondents maintain, however, that the results of the challenged urinalysis will only be used for the administrative function of assessing suitability for employment in the Correction Department and not for purposes of criminal prosecution.
The Fourth Amendment protects against unreasonable searches and seizures undertaken by either the Federal or by State governments. The Supreme Court has held it applicable to the actions of State governments through the Due Process Clause of the Fourteenth Amendment. (Mapp v Ohio, 367 US 643 [1961]; Wolf v Colorado, 338 US 25 [1949].) There is no question that urinalysis testing is a search within the meaning of the Fourth Amendment. (American Fedn. of Governmental Employees, AFL-CIO v Dole, US Dist Ct, DC, CA No. 84-1815.) The question is whether the testing respondents propose is a "reasonable” search.
The United States Supreme Court has not directly addressed the drug testing issue, but the issue has been the subject of several articles and recent court decisions. Although the Supreme Court itself has not yet resolved the question of the constitutionality of drug testing: "the overwhelming majority of courts that have addressed the issue have concluded that except in cases where testing is conducted in highly regulated industries, or during the employee’s annual medical examination, or as part of a pre-employment physical examination for job applicants, the administration of government employee drug testing unsupported by either probable cause or reasonable suspicion constitutes an unreasonable search and seizure.”*
In A Proposal for Mandatory Drug Testing (Note, 62 NYU L Rev 322 [1987]) mandatory drug testing cases are discussed *788 vis-á-vis various industries. Shoemaker v Handel (619 F Supp 1089 [D NJ 1985], affd 795 F2d 1136 [3d Cir], cert denied 479 US 986 [1986]) is cited as an example of a case involving random drug testing of horse racing jockeys. There, random breathalyzer and urinalysis testing of horse racing jockeys was upheld because horse racing is a highly regulated industry.
In Seelig v McMickens (NYLJ, Aug. 7, 1986, at 7, col 2 [Sup Ct, NY County]) drug testing was upheld as part of the employee’s annual medical examination. There, drug testing of correction officers assigned to driving prison vans and buses was upheld as being less intrusive than urinalysis at other times "[i]n view of the strong security and safety considerations involved” in transporting prisoners, and also because of the drivers’ "reduced justifiable privacy expectations”. (Supra, at 11, col 1.)
The cases cited under the preemployment physical examination category are National Treasury Employees Union v Von Raab (816 F2d 170 [5th Cir], stay denied — US —, 107 S Ct 2479 [1987]) which upheld a drug testing program for applicants in certain Customs Service positions (discussed infra) and McDonell v Hunter (612 F Supp 1122, 1130, n 6 [SD Iowa 1985], mod 809 F2d 1302 [8th Cir 1987]) which held that the "Fourth Amendment * * * does not preclude taking a body fluid specimen as part of a pre-employment physical examination”.
The cases which support the unreasonable search and seizure nature of drug testing of government employees are too numerous for discussion here. (See, Note, op. cit., 62 NYU L Rev 339, n 132.) But the following cases deal with uniformed public employees: American Fedn. of Govt. Employees v Weinberger (651 F Supp 726 [SD Ga 1986]) in which random drug testing of Federal civilian police officers employed at military facilities was enjoined, Lovvorn v City of Chattanooga (647 F Supp 875 [ED Tenn 1986]) in which random urinalysis testing of city firefighters was enjoined, Capua v City of Plainfield (643 F Supp 1507 [D NJ 1986]) in which random drug testing of both firefighters and police officers was enjoined, Turner v Fraternal Order of Police (500 A2d 1005 [DC App 1985]), and City of Palm Bay v Bauman (475 So 2d 1322 [Dist Ct App, Fla 1985]) which required a reasonable suspicion standard for drug testing of police officers, and Matter of Caruso v Ward (131 AD2d 214 [1st Dept 1987], supra) with a similar requirement for drug testing of police officers assigned to the New *789 City Police Department’s Organized Crime Control Bureau (see also, cases cited in Matter of Caruso v Ward, supra, 131 AD2d, at 216).
The Supreme Court recently agreed to hear the constitutionality issue of the drug testing involved in Von Raab (supra; see, Justices to Review Mandatory Drug Tests For Public Workers, NYLJ, Mar. 1, 1988, at 1, col 2). Von Raab involves the Customs Service’s urinalysis drug screening program for applicants for positions that either directly involve the interdiction of illicit drugs, require the carrying of a firearm, or involve access to classified information. It is interesting to note that the Customs Service, unlike the respondents here, did not attempt to justify drug screening on the ground that it "suspected a significant level of drug use among its employees” (supra, 816 F2d, at 173). Rather, the court considered the "constitutionality of the program only as it applies to current employees seeking a transfer.” (Supra, at 173.) This was apparently an important factor because a transfer was the "result of a process that [the employee chose] to set in motion” (supra, at 177). The Fifth Circuit held, however, that the warrantless drug tests proposed by the Customs Service were reasonable even without a showing of reasonable suspicion (supra, at 180). Until the Supreme Court definitively decides the constitutionality of random drug testing in Von Raab, this court must rely primarily on those cases which have been decided within its jurisdiction.
The Appellate Division, First Department, in deciding Matter of Caruso v Ward (supra) noted that the recent Court of Appeals case, Matter of Patchogue-Medford Congress of Teachers v Board of Educ. (70 NY2d 57), "requires that reasonable suspicion be established * * * before * * * drug testing [can be implemented].” (Caruso v Ward, 131 AD2d, supra, at 217.) There must be "a balancing of the need for the particular search against the invasion of personal rights that the search entails.” (Bell v Wolfish, 441 US 520, 559 [1979].) Although courts have found that correction officers’ "reasonable expectation of privacy * * * must yield to compelling government interests” (King v McMickens, supra, 120 AD2d, at 353; see also, National Treasury Employees Union v Von Raab, supra, 816 F2d, at 178; McDonell v Hunter, supra, 809 F2d, at 1308), New York courts, nonetheless, still adhere to the "reasonable suspicion” standard. (King v McMickens, supra.)
Random drug searches conducted by the State may be constitutionally permissible without reasonable suspicion *790 "when the privacy interests implicated are minimal, the government’s interest is substantial, and safeguards are provided to insure that the individual’s reasonable expectation of privacy is not subjected to unregulated discretion”. (Matter of Patchogue-Medford Congress of Teachers v Board of Educ., 70 NY2d, supra, at 70.) The court must balance these three factors in determining whether respondents’ proposed regulation should be struck down.
Recent appellate court decisions in New York State have held that urinalysis is "intrusive and an invasion of privacy by its very nature”. (Matter of Caruso v Ward, supra, 131 AD2d, at 217; cf., Matter of Patchogue-Medford Congress of Teachers v Board of Educ., supra, 70 NY2d, at 67-68.) Thus, there is no question that the privacy rights which are implicated are not minimal. The Court of Appeals has stated: "The act of discharging urine is a private, indeed intimate, one and the product may contain revealing information concerning an individual’s personal life and habits for those capable of analyzing it. There is no question that requiring a person to disrobe and expose his body or body cavities, or to empty the contents of his pockets, involves a sufficient intrusion on privacy to constitute a search * * *. Requiring a person to urinate in the presence of a government official or agent, as is sometimes required in these cases * * * is at least as intrusive as a strip search. Even when the individual is permitted to perform the act in private, at the command and supervision of a person designated by the State, privacy interests are implicated. Ordering a person to empty his or her bladder and produce the urine in a container * * * is no less offensive to personal dignity than requiring an individual to empty his pockets and produce a report containing the results of a urinalysis examination.” (Matter of Patchogue-Medford Congress of Teachers v Board of Educ., supra, 70 NY2d, at 67-68.)
This court is mindful of McDonell v Hunter (809 F2d 1302, 1308 [8th Cir 1987], supra), in which a limited uniform and random urinalysis of Iowa Department of Corrections employees who have regular contact with prisoners on a day-to-day basis in medium or maximum security prisons was allowed "[b]ecause the institutional interest in prison security is a central one, because urinalyses are not nearly so intrusive as body searches * * * and because this limited intrusion into the guards’ expectation of privacy is * * * one which society will accept as reasonable”. However, this case is distinguishable from McDonell because the Court of Appeals has found *791 that random urinalysis testing is intrusive and therefore privacy rights are not so easily yielded.
The government’s interest in regulating drug use among its correction officers is substantial. Respondents assert that officers on drugs endanger other officers as well as the safety of inmates. Moreover, the integrity of the Department of Correction is undermined when its officers are involved with any drug use. Indeed, the courts have recognized the special role of correction officers and privacy rights may have to give way when one assumes the responsibilities of this position: "The correction officer occupies a sensitive position and is subject to paramilitary discipline. He cannot perform his demanding duties if impaired by drugs. His reasonable expectation of privacy must yield to compelling governmental interests when he becomes an officer.” (King v McMickens, 120 AD2d 351, 353 [1st Dept 1986], supra.) However, in light of the Court of Appeals finding that the privacy rights implicated are great, respondents must advance a more compelling government interest to justify diminishing a correction officer’s right of privacy.
Addressing the third prong of the Patchogue-Medford balancing test, the court finds that the proposed regulation appears to provide adequate safeguards to insure that the individual’s reasonable expectation of privacy is not subject to unregulated discretion. The integrity of the testing procedure is insured, and the member is required to fill out forms regarding certain foods or medication which might affect the test results. The problem of false positives is eliminated by the confirmatory GC/MS test which is recognized as "highly accurate.” (Drug Testing in the Workplace, 43 [No. 4] Record of Assn of B of City of NY 454, 456 [Report of Comm on Labor and Employment Law].) In addition, the member may designate a lab of his or her own choosing for an independent analysis of the original urine sample. However, no test "can determine how recently the employee was exposed to the drug, how the employee was exposed, or more significantly, whether there was any impairment at the time the sample was taken.” (Id., at 454.)
While the integrity of the program is insured, the random program does not limit the number of times a person may be selected in a given time period. Once a person is randomly chosen, his or her Social Security number is not removed from the list and thus that person may be called again. Similarly, some people may never be selected for drug testing.
*792 Although the safeguards appear adequate, respondents have not shown they have tried alternate less intrusive methods of detecting and deterring drug use before resorting to urinalysis testing without reasonable suspicion. For example, respondents could first implement an educational program regarding drug abuse for both correction officers and supervisors. Random drug testing should not be used as a substitute for employee supervision. Respondents could also provide for a mandatory urine test as part of the officer’s annual physical. In addition, respondent may still employ drug testing upon a showing of reasonable suspicion.
The directive does not set forth the discipline to be imposed when an employee tests positive for drug use. Employees should be advised of the penalties imposed for a positive test result. The Bar Association of the City of New York’s Committee on Labor and Employment Law Report on Drug Testing in the Workplace recommends that employers "should prefer rehabilitation over discipline, where rehabilitation is feasible,” (43 [No. 4] Record of Assn of B of City of NY, at 475). In addition, the Committee observes that disclosure of "an accurate positive test can have unfair effects, since the damage to reputation and careers can outlast the employees rehabilitation.” (Id.) Moreover, the directive does not specifically provide that test results will be kept strictly confidential.
A distinction must also be made between drug testing of current employees and applicants for employment (see, e.g., Matter of Dozier v New York City, 130 AD2d 128 [2d Dept 1987]). "The government has a legitimate interest in testing job applicants, because the government has had no opportunity to observe the applicant in the workplace” (Note, op. cit., 62 NYU L Rev, at 339, n 131). However, "[s]ince most government employees in safety and law enforcement occupations are subject to at least day-to-day observation in the workplace, a supervisor with only minimal training could detect the predictable outward symptoms and the performance impairment associated with drug use and utilize the reasonable suspicion standard to safeguard the government’s interests.” (Id., at 363.) Thus, alternative measures should be implemented before resorting to random drug testing.
Respondents claim that correction officers smuggle and sell drugs to inmates inside the facility. However, respondents do not demonstrate how random drug testing will solve this problem. One does not have to be a drug user to be a drug smuggler or seller.
*793 The question before the court, as noted in American Fedn. of Governmental Employees (supra, at 735), "is not whether drug use, off-duty or on-duty is incompatible with federal [here, State] employment. Rather, the question is by what means is it permissible to come by evidence of such drug use.” (Emphasis in the original.) Quoting McDonell v Hunter (supra), the court continued: " 'There is no doubt about it— searches and seizures can yield a wealth of information useful to the searcher. * * * That potential, however, does not make a governmental employer’s search of an employee a constitutionally reasonable one.’ 612 F. Supp. at 1131. The drug problem in this country is real and it is dangerous. But the methods used to eradicate it must be implemented within constitutional limits, not only because the employees to be tested for drugs have an expectation of privacy, but also because the creation of unfortunate precedent in this area, especially in light of the technological advances of recent years, could and would have a far-reaching impact upon the rights of all citizens in areas outside of the drug context.” (Supra, at 735-736.)
The court finds that respondents’ proposed random drug testing program is a constitutionally unreasonable search and seizure. The directive’s safeguards are insufficient in light of the great intrusion of correction officers’ privacy. Respondents have not shown that other, less intrusive means to detect drug users among correction officers have been implemented and have failed. Absent such a showing, this court is constrained to follow the decisions in Patchogue-Medford (supra) and Caruso (supra).
Courts have consistently struck down similar directives and this court finds that respondents have failed to present a detailed procedure or compelling circumstances sufficient to justify deviating from the law of this State.
Accordingly, the petition is granted and respondents are enjoined from implementing the random drug testing program contained in their November 17, 1987 directive.

 Note, A Proposal for Mandatory Drug Testing of Federal Civilian Employees, 62 NYU L Rev 322, 338-339 (1987); see also, Baer, Substance Abuse, NYLJ, June 5, 1987, at 1, col 1, at 2, col 2; Hall, Search and Seizure, Cum Supp § 17:10.1, at 494 (1987); LeFave, Search and Seizure § 10.3 (c) (1987); Matter of Patchogue-Medford Congress of Teachers v Board of Educ., 70 NY2d 57, 64.